2254 ✓ 1983

FILING FEE PAID
Yes ___ No ✓

IFP MOTION FILED
Yes ✓ No ___

COPIES SENT TO
Court ✓ ProSe ___

FILED
JUN 13 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

NAME ARMANDO GARDUNO

PRISON NUMBER
E-92339

CURRENT ADDRESS OR PLACE OF CONFINEMENT
120-2-59U, P.O. BOX 9
AVENAL, CA 93204
CITY, STATE, ZIP CODE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

ARMANDO GARDUNO ,
(FULL NAME OF PETITIONER)

PETITIONER

v.

BOARD OF PAROLE HEARING ET AL.
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS])

RESPONDENT

and

,

The Attorney General of the State of California, Additional Respondent.

Civil No '08 CV 1058 JAH NLS
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack:

2. Date of judgment of conviction:

3. Trial court case number of the judgment of conviction being challenged:

4. Length of sentence:



CR

5. Sentence start date and projected release date:
FEBRARY 4, 1991 SENTENCED, PROJECTED RELEASE UNKNOWN.

6. Offense(s) for which you were convicted or pleaded guilty (all counts):

7. What was your plea? (CHECK ONE)

(a) Not guilty [X]
(b) Guilty [ ]
(c) Nolo contendere [ ]

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)

(a) Jury [X]
(b) Judge only [ ]

9. Did you testify at the trial?

[ ] Yes [ ] No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
[ ] Yes [X] No

11. If you appealed in the **California Court of Appeal**, answer the following:
(a) Result:
(b) Date of result (if known):
(c) Case number and citation (if known):
(d) Names of Judges participating in case (if known):
(e) Grounds raised on direct appeal:

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
(a) Result:
(b) Date of result (if known):
(c) Case number and citation (if known):
(d) Grounds raised:

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:
    (a) Result:
    (b) Date of result (if known):
    (c) Case number and citation (if known):
    (d) Grounds raised:

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
☐ Yes ☒ No

15. If your answer to #14 was "Yes," give the following information:
    (a) **California Superior Court** Case Number (if known):
    (b) Nature of proceeding:
    (c) Grounds raised:
    (d) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes ☐ No
    (e) Result:
    (f) Date of result (if known):

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
☐ Yes ☒ No

17. If your answer to #16 was "Yes," give the following information:

(a) **California Court of Appeal** Case Number (if known):

(b) Nature of proceeding:

(c) Names of Judges participating in case (if known)

(d) Grounds raised:

(e) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes ☐ No

(f) Result:

(g) Date of result (if known):

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☐ Yes ☒ No

19. If your answer to #18 was "Yes," give the following information:

(a) **California Supreme Court** Case Number (if known):

(b) Nature of proceeding:

(c) Grounds raised:

(d) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes ☐ No

(e) Result:

(f) Date of result (if known):

**20.** If you did ***not*** file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

PETITIONER HAS EXHAUSTED ALL STATE REMEDIES.

## COLLATERAL REVIEW IN FEDERAL COURT

**21.** Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
[X] Yes [ ] No (IF "YES" SKIP TO #22)

(a) If no, in what federal court was the prior action filed?

(i) What was the prior case number?

(ii) Was the prior action (CHECK ONE):

Denied on the merits? [ ]

Dismissed for procedural reasons? [ ]

(iii) Date of decision:

(b) Were any of the issues in this current petition also raised in the prior federal petition?
[ ] Yes [ ] No

(c) If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
[ ] Yes [ ] No

---

**CAUTION:**

- **Exhaustion of State Court Remedies:** In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present ***all*** other grounds to the California Supreme Court before raising them in your federal Petition.
- **Single Petition:** If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.
- **Factual Specificity:** You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

## GROUNDS FOR RELIEF

22. **State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground.** (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.) If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

**(a) GROUND ONE**: Petitioner claims in his Board of Prison Hearing of November 16, 2006, he was found unsuitable for parole, that he would pose an "unreasonable risk to public safety." The Board did not point to or show any evidence he remains a "current threat" to public safety, violating his right to due process.

**Supporting FACTS**:

All the records before the Board contradicts its decision that petitioner was unsuitable for parole. Petitioner rely's upon the hearing transcripts (exhibit A), specifically pages 64-70, as well as petitioner's psychological evaluation (exhibit B, pg. 5-8, and, petitioner's Counseling Report (exhibit C). No evidence what so ever is in refute here or supports the Board's decision to deny petitioner parole, nor is there any evidence to show petitioner to be a "current risk to public safety."

See also In re Baker, cited as 2007 DJDAR; In re Lawrence, cited as 2007 DJDAR; In re Wielder, Cited as 2006 DJDAR 15795; In re Phillips, cited as 2007 DJDAR 2004.

**Did you raise GROUND ONE in the California Supreme Court?**

XX Yes X No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Habeas petition

(2) Case number or citation: S157330

(3) Result (attach a copy of the court's opinion or order if available): Petition denied.

(b) GROUND TWO: Petitioner claims he was denied due process because the Board used standards and criteria which were unconstitutionally vague in finding him unsuitable for parole. Alternatively, even if the standards are constitutionally sound, nonetheless has been applied in an arbitrary and meaningless fashion by the Board.

**Supporting FACTS:**

Petitioner rely's on the facts that the courts have held that to fit within those criteria and thus serve as a basis for a finding of unsuitability, the circumstances of the crime must be more than aggravated or violent than the minimum necessary to sustain a conviction for that offence. (See In re Rosenkrantz (2002) 29 Cal. 4th 616, 682-683.) Petitioner claims that the criteria, 15 CCR Sub. Sec. 2402, even if constitutionally sound, has been applied by the Board in an arbitrary and capricious manner, rendering them devoid of any meaning what ever. (See also In re Rodriguez, (1975) 14 Cal.3d 639, 648, quoting Minnesoto v. Probate Court (1940) 309 U.S. 270. 277. In re Minnis (1972) 7 Cal.3d 639, 645; In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564, quoting In re Strum (1974) 11 Cal.3d 258 at p. 268.)

**Did you raise GROUND TWO in the California Supreme Court?**

XXYes XX No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Habeas Petition

(2) Case number or citation: S157330

(3) Result (attach a copy of the court's opinion or order if available):
Petition denied.

(c) GROUND THREE: Petitioner claims the Board has violated his due process by a continued reliance upon the commitment offense, a factor that can never change nor can he over-come, even after petitioner has served more than 16 years for Attempted Murder 1st, an immutable factor.

**Supporting FACTS**:

Petitioner's commitment offense, now over 18 years of incarceration, does not provide "some evidence" that he is unsuitable for parole and a risk to public safety if released to the community. Even so, this is a factor which petitioner can never change or over-come no matter what he does or how long he may be incarcerated. (See In re Lawrence cited as 2007 DJDAR 7363; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910; Irons v. Carey (9th Cir. 2007) 479 F.3d 658; In re Lee (2006) 143 Cal.App. 4th 1400, 1408 italics added; In re Scott (2005) 133 Cal.App.4th 573, 595 italics added.

**Did you raise GROUND THREE in the California Supreme Court?**

XXYes XXNo.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Habeas Petition

(2) Case number or citation: S157330

(3) Result (attach a copy of the court's opinion or order if available):
Petition denied.

(d) **GROUND FOUR**:

**Supporting FACTS**:

**Did you raise GROUND FOUR in the California Supreme Court?**

☐ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition):

(2) Case number or citation:

(3) Result (attach a copy of the court's opinion or order if available):

**23.** Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes ☒ No

**24.** If your answer to #23 is "Yes," give the following information:

(a) Name of Court:

(b) Case Number:

(c) Date action filed:

(d) Nature of proceeding:

(e) Name(s) of judges (if known):

(f) Grounds raised:

(g) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes ☐ No

**25.** Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing . . . . . . . . unknown

(b) At arraignment and plea . . . . . . . unknown

(c) At trial . . . . . . . . . . . . . . . . . . . . . unknown

(d) At sentencing . . . . . . . . . . . . . . . unknown

(e) On appeal . . . . . . . . . . . . . . . . . .

(f) In any post-conviction proceeding .

(g) On appeal from any adverse ruling in a post-conviction proceeding:

**26.** Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
[X] Yes [ ] No

**27.** Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
[ ] Yes [X] No

(a) If so, give name and location of court that imposed sentence to be served in the future:

(b) Give date and length of the future sentence:

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
[ ] Yes [XX] No

**28.** Consent to Magistrate Judge Jurisdiction

In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to procced before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

[ ] Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

[XX] Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

**29.** Date you are mailing (or handing to a correctional officer) this Petition to this court: 6/04/08

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

6/04/08

(DATE)

SIGNATURE OF PETITIONER

ORIGINAL

**S157330**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re ARMANDO GARDUNO on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

George, C. J., was absent and did not participate.

SUPREME COURT
FILED
APR 23 2008
Frederick K. Ohlrich Clerk

Deputy

WERDEGAR
Acting Chief Justice

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life Term Parole Consideration Hearing of: )

ARMANDO GARDUNO )

CDC Number E-92339

IRONWOOD STATE PRISON

BLYTHE, CALIFORNIA

NOVEMBER 16, 2006

**PENDING REVIEW AND APPROVAL**

PANEL PRESENT:

Archie "Joe" Biggers, Presiding Commissioner
Alejandro Armenta, Deputy Commissioner

OTHERS PRESENT:

Armando Garduno, Inmate
Linda Buchalter, Attorney for Inmate
Mike Motikeit, Deputy District Attorney
Correctional Officer (unidentified)

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes

See Review of Hearing Transcript Memorandum

**Shelley Kelber Northern California Court Reporters**

INDEX


| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 10 |
| Pre-Commitment Factors | 11 |
| Post-Commitment Factors | 16 |
| Parole Plans | 32 |
| Closing Statements | 44 |
| Recess | 62 |
| Decision | 64 |
| Adjournment | 70 |
| Transcriber Certification | 71 |


--oOo--

**P R O C E E D I N G S**

**PRESIDING COMMISSIONER BIGGERS:** Subsequent parole consideration hearing for Armando Garduno.

**INMATE GARDUNO:** Garduno.

**PRESIDING COMMISSIONER BIGGERS:** G-A-R-D-U-N-O, CDC number is E-92339. Today's date is November 16th, 2006, and we are located at the Ironwood State Prison. Inmate was received on April 11th, 1991, from San Bernardino County. The life term began on March 8th, 1995, and a minimum eligible parole date was March 8th, 2002. The controlling offense for which the inmate has been committed is attempted murder first degree. The case number is SCR, that's Sam, Charlie, Ray, 52216, that was one count, which is a violation of P32664/187. There were also some additional commitments. The first one being the use of a firearm which is a violation of P12022.5, .5, excuse me, same county, same case number, it's count one. GBI, great bodily injury, which is in violation of P12022.7, same county, same case number, it's also a count one. Mayhem, which is in violation of PC203, same county, same case, (inaudible) count two. Use of a firearm, P1202.5, same county, same case number, which is count two, and great bodily injury, P12022.7, same county, same case number, also count number two. As I stated previously, the inmate received a term of life plus seven years, with a minimum eligible date of March 8th, 2002. Mr. Garduno,

this hearing is being tape recorded. For the purpose of voice identification each of us will state our first and last names, spelling our last name. When we get to you sir, after spelling your last name, please give us your CDC number. I will start and move to my right. My name is Archie "Joe" Biggers, B-I-G-G-E-R-S, and I'm a commissioner with the Board of Parole Hearings.

**DEPUTY COMMISSIONER ARMENTA:** My name is Alejandro Armenta, A-R-M-E-N-T-A. I'm a deputy commissioner.

**DEPUTY DISTRICT ATTORNEY MOTIKEIT:** Mike Motikeit, M-O-T-I-K-E-I-T, Deputy District Attorney, San Bernardino County.

**ATTORNEY BUCHALTER:** Linda Buchalter, B-U-C-H-A-L-T-E-R, attorney for Mr. Garduno.

**INMATE GARDUNO:** My name is Armando Garduno, G-A-R-D-U-N-O, CDC number E-92339.

**PRESIDING COMMISSIONER BIGGERS:** All right. Thank you. And for the record note that we have a correctional officer present for security purposes only, he will not be participating in the hearing. Before we begin, Mr. Garduno, there is an ADA statement in front of you, that's on the yellow sheet. Would you please read that out loud for us.

**INMATE GARDUNO:** Yes.

"The Americans with Disabilities Act, ADA, is a law to help people with

disabilities. Disabilities are problems that make it harder for some people to see, hear, breathe, talk, walk, learn, think, work, or take care of themselves than it is for others. Nobody can be kept out of public places or activities because of a disability. If you have a disability, you have the right to ask for help to get ready for your BPT hearing, get to the hearing, talk, read forms and papers, and understand the hearing process. BPT will look at what you ask for to make sure that you have a disability that is covered by the ADA, and that you have asked for the right kind of help. If you do not get help, or if you don't think you got the kind of help you need, ask for a BPT 1074 Grievance Form. You can also get help to fill it out."

**PRESIDING COMMISSIONER BIGGERS:** All right. Thank you, sir. I see hear that you signed a 1073 on June 7th, 2006, is that correct?

**INMATE GARDUNO:** That's correct.

**PRESIDING COMMISSIONER BIGGERS:** Okay. And all the information is still correct?

**INMATE GARDUNO:** Yes, it certainly is.

**PRESIDING COMMISSIONER BIGGERS:** Thank you. I see that you wear glasses.

**INMATE GARDUNO:** Yes I do.

**PRESIDING COMMISSIONER BIGGERS:** Okay. Although it's not a part of the American with Disabilities Act, it's always a good idea when you do your 1073, that if you have glasses, just make a notation so that if you come here without glasses it would help us to make sure that you may need to have your glasses.

**INMATE GARDUNO:** Okay.

**PRESIDING COMMISSIONER BIGGERS:** Okay.

**INMATE GARDUNO:** Okay.

**PRESIDING COMMISSIONER BIGGERS:** You need any magnifying device, anything to help you?

**INMATE GARDUNO:** I don't need anything, no.

**PRESIDING COMMISSIONER BIGGERS:** You have any hearing impairments?

**INMATE GARDUNO:** No, I don't.

**PRESIDING COMMISSIONER BIGGERS:** Have you ever been included in a CCCMS or EOP program?

**INMATE GARDUNO:** I have not.

**PRESIDING COMMISSIONER BIGGERS:** You know what those are?

**INMATE GARDUNO:** Yes I do, yeah, (inaudible).

**PRESIDING COMMISSIONER BIGGERS:** Have you ever taken any psychotropic medication?

**INMATE GARDUNO:** No, I haven't, no I haven't.

PRESIDING COMMISSIONER BIGGERS: And do you suffer from any disabilities that would prohibit you from participating in today's hearing?

INMATE GARDUNO: No I don't.

PRESIDING COMMISSIONER BIGGERS: I'm going to ask your attorney, Miss Buchalter, do you feel that your client's ADA rights have been met ma'am?

ATTORNEY BUCHALTER: Well, with a caveat, he's handcuffed so tightly Commissioners, I find it interesting he's, you make sure he can see and hear and walk, which, that's why we're sure, it's a federal law, and handle (inaudible) he's handcuffed so tightly I don't know he can get into his briefcase or anything. I object to his handcuffs, on the record.

PRESIDING COMMISSIONER BIGGERS: That's a institutional policy, ma'am, that I have no control over, any of it. As far as I know, that when they only have one correctional officers present they have to have him in handcuffs.

DEPUTY COMMISSIONER ARMENTA: So your objection is noted.

PRESIDING COMMISSIONER BIGGERS: All right. This hearing is going to be conducted pursuant to Penal Code section 3041 and 3042, and the rules and regulations for the Board of Prison Terms subsequent parole consideration hearings for life inmates. The purpose of today's hearing, sir, is to once again

consider the number and nature of the crimes you were committed for, your prior criminal and social history, and your behavior and programming since your commitment. You have had the opportunity to review to your Central File and your prior transcript, and you will be given the opportunity to correct or clarify the record. We will reach a decision today and inform you whether or not we find you suitable for parole and the reasons for our decision. If you are found suitable for parole, the length of your confinement will be explained to you. Nothing that happens here today will change the findings of the court. This panel is not here to retry your case, you understand that, sir?

**INMATE GARDUNO:** Yes, I understand.

**PRESIDING COMMISSIONER BIGGERS:** Okay. The panel is here for the sole purpose of determining your suitability for parole. Do you understand that?

**INMATE GARDUNO:** Yes I do.

**PRESIDING COMMISSIONER BIGGERS:** Okay. Thank you. Your hearing is going to be held in three stages. I will talk with you and discuss with you the, your commitment offense as well as your prior criminal and social history. Deputy Commissioner Armenta will then go into your post conviction factors, to include your psychological evaluation and I will return and talk about your parole plans, any letters of support and/or opposition in your file. Once this is concluded both

commissioners, the district attorney, and your attorney will be given the opportunity to ask you questions. Questions from the district attorney shall be asked of the chair and you will direct your answers to the panel and not to the district attorney. Next, the district attorney, then your attorney, then you will be given the opportunity to make a final statement regarding your parole suitability. Your statement should address why you feel you are suitable for parole. The panel will then recess, clear the room and deliberate. Once the deliberations are completed the panel will resume the hearing and announce its decision. The California Code of Regulations state that, regardless of time served, the life inmate shall be found unsuitable for, and denied, parole if in the judgment of the panel the inmate would pose an unreasonable risk of danger to society if released from prison. You have certain rights, sir. These rights include the timely notice of this hearing, the right to review your Central File, and I see that you viewed your Central File on June 9th, 2006, is that correct? And you also have the right to present relevant documents. At this point, I'm going to ask your attorney again if she feels that your rights have been met?

**ATTORNEY BUCHALTER:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** Okay. Thank you. You have an additional right to be heard by an

impartial panel, do you have any objections to the panel members, sir?

**INMATE GARDUNO:** No, I don't, sir.

**PRESIDING COMMISSIONER BIGGERS:** Okay. Do you, Counselor, do you have any objections?

**ATTORNEY BUCHALTER:** No, no.

**PRESIDING COMMISSIONER BIGGERS:** Thank you. I'm going to ask the Deputy Commissioner if any confidential material will be used?

**DEPUTY COMMISSIONER ARMENTA:** None.

**PRESIDING COMMISSIONER BIGGERS:** Okay. Thank you. I'm going to mark the (inaudible) establish this as Exhibit 1, and pass it to your attorney as well as the district attorney to insure that we're all operating on the same set of documents. (inaudible)

**DEPUTY DISTRICT ATTORNEY MOTIKEIT:** Yes, sir.

**PRESIDING COMMISSIONER BIGGERS:** Thank you.

**ATTORNEY BUCHALTER:** Thank you.

**PRESIDING COMMISSIONER BIGGERS:** You're welcome.

**ATTORNEY BUCHALTER:** I have these documents.

**PRESIDING COMMISSIONER BIGGERS:** All right, thank you, ma'am.

**DEPUTY DISTRICT ATTORNEY MOTIKEIT:** Yes, I have these documents.

**PRESIDING COMMISSIONER BIGGERS:** Okay, thank you, let the record reflect that both attorneys do have the documents. Are there any additional documents to be

submitted, ma'am?

**ATTORNEY BUCHALTER:** Yeah, I do, Commissioner, I have a (inaudible) some updated letters from his family, it's pretty extensive and some AA programs that he (inaudible) on the outside and also (inaudible) a magnificent letter from Dr. (inaudible).

**PRESIDING COMMISSIONER BIGGERS:** (inaudible) Thank you.

**ATTORNEY BUCHALTER:** Thank you. I think there's some chronos in there too and a couple of things from education that he may not have made it into the C-File in time.

**PRESIDING COMMISSIONER BIGGERS:** All right. I'll pass these over to the deputy commissioner.

**ATTORNEY BUCHALTER:** Yes, thank you.

**PRESIDING COMMISSIONER BIGGERS:** (inaudible) chronos (inaudible) report.

**ATTORNEY BUCHALTER:** Thank you, Commissioner.

**PRESIDING COMMISSIONER BIGGERS:** (inaudible) I'll keep the art work for decoration as well as the letter (inaudible).

**ATTORNEY BUCHALTER:** Okay, thank you.

**PRESIDING COMMISSIONER BIGGERS:** Okay, are there any preliminary objections other than the one you had made earlier, ma'am?

**ATTORNEY BUCHALTER:** No.

**PRESIDING COMMISSIONER BIGGERS:** Okay. Will the

inmate be speaking to the panel?

**ATTORNEY BUCHALTER:** Commissioners, you have advised my client that he has the right to not speak about the life offense, I assume you did, and if he does, it certainly can't be held against him in any way. I've advised Mr. Garduno to not speak about the life offense today, Commissioners. He has discussed the facts of the case with the board members on many a prior occasion. He's discussed the facts other, many times with others, such as counselors, psychologists, and psychiatrists, probation officer and others. His version of the facts have been documented many times and they are available to you. We are not here to retry this case today, we are here only about whether or not he poses a danger to society at this point in time and not his dangerousness at the time of the commitment offense. That is a given. If there are any discrepancies in his version of the facts versus others who might have a version, he will accept whatever view the panel wishes to adopt. Nothing alters the fact of the crime and my client accepts full responsibility and he has been punished for this offense. His punishment includes an expectation of being released after he has served the minimum required by law and no longer an unreasonable risk of harm to others. We are here today about the factors bearing on that one question. He will discuss with you, Commissioners, all the matters,

including his remorse, about the life offense.

**PRESIDING COMMISSIONER BIGGERS:** All right. Thank you. I think you covered it very well, and I am a little reluctant to even go into the remorse aspect because that may open things (inaudible) for the district attorney. So I'm going to move right into the social history. Mr. Garduno, you were born in Mexico?

**INMATE GARDUNO:** Yes, that's correct, sir.

**PRESIDING COMMISSIONER BIGGERS:** Okay. And your mother and father are still living, is that correct?

**INMATE GARDUNO:** Yes, they are, yes.

**PRESIDING COMMISSIONER BIGGERS:** Okay. You were 17, I'm sorry, 20 years old when this crime was committed?

**INMATE GARDUNO:** Yes, that's correct, sir.

**PRESIDING COMMISSIONER BIGGERS:** Your father worked in construction and your mother was a homemaker.

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** Okay, and you were raised in, your parents now live in Hesperia.

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** Okay. And it appears here from your record that they visit you every two, three months.

**INMATE GARDUNO:** Approximately, yes.

**PRESIDING COMMISSIONER BIGGERS:** You say you had five siblings?

**INMATE GARDUNO:** I have six siblings, sir.

**PRESIDING COMMISSIONER BIGGERS:** Six.

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** Okay. And you're the only one with a criminal history?

**INMATE GARDUNO:** Yes, sir, that's right.

**PRESIDING COMMISSIONER BIGGERS:** See what we got, two sisters, or three sisters?

**INMATE GARDUNO:** I've got four sisters and two brothers.

**PRESIDING COMMISSIONER BIGGERS:** Four sisters and two brothers. And both of your brothers are in the United States Navy?

**INMATE GARDUNO:** Well, they're both (inaudible) my brother, he's still serving as a doctor for the naval forces (inaudible).

**PRESIDING COMMISSIONER BIGGERS:** And your other one is thinking about becoming an architect?

**INMATE GARDUNO:** (inaudible) yes.

**PRESIDING COMMISSIONER BIGGERS:** That's very good work. Near the age of 18 you moved in with your high school girlfriend, (inaudible) her family.

**INMATE GARDUNO:** Yes, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** Okay and (inaudible) get married?

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Okay. And you

had a son?

**INMATE GARDUNO:** I've got two sons.

**PRESIDING COMMISSIONER BIGGERS:** Two sons. Okay. And I see here that the judge did allow you to get married while you were in the penitentiary.

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** Your son, Marco and Anthony?

**INMATE GARDUNO:** Yes, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** And I see your marriage lasted from 1995 to 1996.

**INMATE GARDUNO:** That's the (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** And your ex-wife is now re-married.

**INMATE GARDUNO:** Yes she is.

**PRESIDING COMMISSIONER BIGGERS:** But you're still supporting your two sons.

**INMATE GARDUNO:** Yes, (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** All right. Thank you. And you don't actually have any military time. You dropped out of high school, you were working for the construction company in Rancho Cucamonga?

**INMATE GARDUNO:** Yes, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** And you began experimenting with marijuana and alcohol when you were in the 9th grade?

**INMATE GARDUNO:** I started messing around when I

was eight or nine (inaudible) with alcohol when I was (inaudible).

**PRESIDING COMMISSIONER BIGGERS:** (inaudible)

**INMATE GARDUNO:** I was in, (inaudible) the 10th grade, but about 15 years old.

**PRESIDING COMMISSIONER BIGGERS:** How did your family take that were you not working for them?

**INMATE GARDUNO:** They were disappointed. I remember mom was disappointed and dad was disappointed. My dad gave me an option though, if you don't want to go to school then you come work with me. So I chose to go to work with him.

**PRESIDING COMMISSIONER BIGGERS:** You moved into your girlfriend's house at the age of 16.

**INMATE GARDUNO:** (inaudible) I was living on and off (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Okay, is there anything that I've left out of your social history, sir, that you'd like to add to it?

**INMATE GARDUNO:** Well, I did have, I worked at my job for five years and (inaudible) I did try to support my ex-wife now and I supported (inaudible) financially and I had my own apartment. I was, I was actually, you know, doing pretty well until (inaudible).

**PRESIDING COMMISSIONER BIGGERS:** All right. And then I want to ask our attorney, does she feel that she needs to add anything to the social history I just

mentioned now?

**ATTORNEY BUCHALTER:** No, Commissioner, thank you.

**PRESIDING COMMISSIONER BIGGERS:** Okay. I see here that you had no juvenile record. However, you were arrested as an adult in '88 for assault (inaudible) about that?

**INMATE GARDUNO:** Yes I will, I was arrested (inaudible), I was convicted (inaudible) later (inaudible) but I was convicted, uh-huh.

**PRESIDING COMMISSIONER BIGGERS:** All right. It shows here that you got a 180 days in County Jail.

**INMATE GARDUNO:** (inaudible) stayed the sentence (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Okay, who was the assault on?

**INMATE GARDUNO:** It was someone (inaudible) some type of bottle or beer can and he had said that is was, it was me that did it.

**PRESIDING COMMISSIONER BIGGERS:** (inaudible) but they found you guilty of that.

**INMATE GARDUNO:** Yes, they found me guilty.

**PRESIDING COMMISSIONER BIGGERS:** You were arrested in '89 for possession of alcohol and you were in County Jail for 3 days then.

**INMATE GARDUNO:** Yes, sir, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** And again in

'89 arrested by Highway Patrol for driving under the influence and they gave you two years at CNR.

**INMATE GARDUNO:** They gave me actually two years on (inaudible) probation.

**PRESIDING COMMISSIONER BIGGERS:** And then you got 45 days time in jail with that one (inaudible)?

**INMATE GARDUNO:** (inaudible) served maybe like three days, two days.

**PRESIDING COMMISSIONER BIGGERS:** All right. And then you had the, the commitment offense which was done in June 15th of 1990.

**INMATE GARDUNO:** That's correct, yes.

**PRESIDING COMMISSIONER BIGGERS:** Are there any priors that I failed to mention?

**INMATE GARDUNO:** No, I believe that covers it all, sir.

**PRESIDING COMMISSIONER BIGGERS:** Is there anything else you have to add on the social or the priors?

**INMATE GARDUNO:** No, I don't.

**PRESIDING COMMISSIONER BIGGERS:** Do you have any questions about the priors or the social Deputy Commissioner Armenta.

**DEPUTY COMMISSIONER ARMENTA:** No.

**PRESIDING COMMISSIONER BIGGERS:** Okay. At this point then I'm going to ask Deputy Commissioner Armenta to go over your post conviction activities. Thank you,

sir.

**DEPUTY COMMISSIONER ARMENTA:** Okay. Let's get your name straight. Garduno?

**INMATE GARDUNO:** Garduno, yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** Armando.

**INMATE GARDUNO:** Armando, yes.

**DEPUTY COMMISSIONER ARMENTA:** And what do they call you, Mundo or?

**INMATE GARDUNO:** No, Mando. Short for Armando.

**DEPUTY COMMISSIONER ARMENTA:** Now, the reason I'm asking you because I looked in the reports and some of them, they say Mondo, M-O-N-D-O, and others, they say Mundo. Then when I saw your name I knew it had to be Mando.

**INMATE GARDUNO:** Yeah, Mando.

**DEPUTY COMMISSIONER ARMENTA:** Okay. I just want to go over what you've been doing since you were received by CDC on 4/11/1991. And basically the report, as you, actually done since your last hearing, which was on February 19th, 2004, was held here, and at that time you were denied for a year. You came back not too long ago for a hearing but it could not be held. Prior to that, on November 2002, you were denied for two years and I believe in your first hearing you were denied for a year.

**INMATE GARDUNO:** That's correct.

**DEPUTY COMMISSIONER ARMENTA:** You got your

scores down to the minimum, which is 19. And I've gone over your C-File, I've been going over the reports. The report prepared by Craig (inaudible) he prepared a report, the last report I have is (inaudible) I believe from the last hearing that was going to be help in October. I have that report also (inaudible) report as well as the (inaudible) progress report prepared by Correctional Officer Morris. I also went further back in some of these reports, reports I think from 2004, 2002, by Correctional Officer (inaudible)

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** Also the psychological report prepared by Diane Smith, dated July 8th, 2005. You've done, done a lot. You've done, you've been involved in vocational training. I found a certificate of completion from the garment manufacturing. I also found that you've been involved and I'm not sure if you completed a mechanical drafting?

**INMATE GARDUNO:** Yes, I completed that, yes.

**DEPUTY COMMISSIONER ARMENTA:** Did you get a certificate?

**INMATE GARDUNO:** Yes, I do.

**DEPUTY COMMISSIONER ARMENTA:** (inaudible)

**INMATE GARDUNO:** Not yet.

**DEPUTY COMMISSIONER ARMENTA:** You also earned an AA degree?

**INMATE GARDUNO:** Yes, I did.

**DEPUTY COMMISSIONER ARMENTA:** At Coastline (phonetic) College.

**INMATE GARDUNO:** Yes.

**DEPUTY COMMISSIONER ARMENTA:** Yeah, that's good. You also passed your GED now, back in 1994.

**INMATE GARDUNO:** Yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** (inaudible)

**INMATE GARDUNO:** Actually, (inaudible) chronos on the (inaudible) that's the (inaudible).

**DEPUTY COMMISSIONER ARMENTA:** Okay. Certificate of vocational achievement (inaudible) education program that confer upon Armando Garduno, this (inaudible) performance in the vocational mechanical drafting and all the rights and privileges pertaining to, February 2nd, 1998. You actually keep these, you keep these well.

**INMATE GARDUNO:** Thank you. The ones in front are the ones that (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** I know you've been involved in different Bible studies.

**INMATE GARDUNO:** That is correct.

**DEPUTY COMMISSIONER ARMENTA:** And I see the certificate here for completion of (inaudible) school of the Bible, it has your name and (inaudible). And also, I know you've been very involved in literacy.

**INMATE GARDUNO:** This is correct.

**DEPUTY COMMISSIONER ARMENTA:** (inaudible) lots

of certificates for having completed different hours, different workshops and you've also been a tutor.

**INMATE GARDUNO:** Yes.

**DEPUTY COMMISSIONER ARMENTA:** I have your GED here, it's also in your C-File. Now there's a, there is a completion (inaudible) and I saw a 104 hour week, 104 week certificate for involvement in (inaudible) 2006.

**INMATE GARDUNO:** Yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** You've also been involved in K through 8, and many, many certificates for your participation in literacy and tutoring. You also got involved and completed a course entitled Breaking Barriers.

**INMATE GARDUNO:** That's correct.

**DEPUTY COMMISSIONER ARMENTA:** And we've got to get into your, into your, your chronos, okay?

**INMATE GARDUNO:** Okay.

**DEPUTY COMMISSIONER ARMENTA:** We have a lot, I'm going to ask you at some point of, if there's certain, in particular, you want me to read?

**INMATE GARDUNO:** Okay.

**DEPUTY COMMISSIONER ARMENTA:** You know, it's going to be very difficult to read all 50 of them. You've got a lot of them. You've been a teacher's assistant at some point.

**INMATE GARDUNO:** Yes, I have, yes.

**DEPUTY COMMISSIONER ARMENTA:** (inaudible)

**INMATE GARDUNO:** Yes.

**DEPUTY COMMISSIONER ARMENTA:** (inaudible)

**INMATE GARDUNO:** Yes.

**DEPUTY COMMISSIONER ARMENTA:** At some point. Are there any other, any other jobs you've had?

**INMATE GARDUNO:** (inaudible) I've been a clerk for (inaudible) kitchen worker, (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** You seem like the type that, you will be asked by staff if you want to work with them?

**INMATE GARDUNO:** Actually, the communication is (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** You also completed a certificate of completion for Effective Communications? That's a part of the actor's group?

**INMATE GARDUNO:** Yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** You also took a six-month course on rehabilitative therapeutic techniques training.

**INMATE GARDUNO:** Yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** Was that, was that pretty intense?

**INMATE GARDUNO:** Yes, sir, it was, because it kind of sounded like (inaudible) talk about (inaudible) group type of thing. It was a, it was something that I felt I needed myself (inaudible) share with others.

**DEPUTY COMMISSIONER ARMENTA:** You've been

involved in tutoring, and also a peer educator.

**INMATE GARDUNO:** Yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** So, you also teach?

**INMATE GARDUNO:** That's actually (inaudible) what it is, is I, I'm (inaudible) and stuff like this, it's more or less just trying to get the information out, as far as trying to help them out (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** But in doing that, that makes you a positive feeder (phonetic).

**INMATE GARDUNO:** Yes, that is correct.

**DEPUTY COMMISSIONER ARMENTA:** How do you feel about that?

**INMATE GARDUNO:** I actually feel pretty good, I think I do.

**PRESIDING COMMISSIONER BIGGERS:** You have a lot of that certificate (inaudible) education, you've been pretty active. (inaudible)

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** How'd you feel when you got here?

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** (inaudible)

**INMATE GARDUNO:** My brother wants me to go to the university (inaudible) college when I can afford it, (inaudible) he wants to pay my way through college, but I want to try to achieve it on my own.

**DEPUTY COMMISSIONER ARMENTA:** I'm kind of surprised that being here, that you didn't take the courses at the school here.

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** The AA here at, you know, at CDC.

**INMATE GARDUNO:** Okay, I feel (inaudible), in fact I have a letter (inaudible) I took a class and what happened was they wanted me to transfer to B yard to continue with (inaudible) but I wanted to finish up (inaudible) first before I went (inaudible) continue with (inaudible).

**DEPUTY COMMISSIONER ARMENTA:** Good planning. Your transcripts here, the different courses you've taken.

**INMATE GARDUNO:** Yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** The (inaudible) school of Bible?

**INMATE GARDUNO:** That's correct, yes.

**DEPUTY COMMISSIONER ARMENTA:** (inaudible)

**INMATE GARDUNO:** Yeah, that's, that's actually (inaudible) certificate (inaudible).

**DEPUTY COMMISSIONER ARMENTA:** I see there's a (inaudible).

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** You are now (inaudible).

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** Okay. All right. Let's just get into some of your chronos, okay?

**INMATE GARDUNO:** Yeah.

**DEPUTY COMMISSIONER ARMENTA:** This being written for the Board of Parole Hearings, Correctional Officer McDonald (phonetic), October 30th, 2006, on behalf of Inmate Garduno, I have consistently observed that Inmate Garduno is a very respectful and courteous individual who's obvious maturity and rehabilitation is evident as his conduct with staff and with other inmates has been exemplary. His conduct is to be commended. And we've got a chrono for having graduated with you're AA from Coastline. And, Kelly Spellman (phonetic), college coordinator, says I personally have observed, for several years, his pattern of conduct. He's a talented tutor for students at all levels, of all levels, admired by staff and students. Mr. Garduno is mature and well deserving of a second chance to become a positive part of our society with the experiences he can contribute. Dated November 13th, 2006. That's very recent.

**INMATE GARDUNO:** Yes.

**DEPUTY COMMISSIONER ARMENTA:** Like we will say, hot from the press?

**INMATE GARDUNO:** Yeah.

**DEPUTY COMMISSIONER ARMENTA:** Okay. June 17th, 2006, Correction Officer J. (inaudible), at this point

(inaudible) Inmate Garduno is a chrono for his upcoming parole hearing. I personally have observed that Inmate Garduno conducts himself with other staff and other inmates, he has a positive attitude and he is very courteous. He is an outstanding artist and a very respectful individual. I believe he has an affirmative outlook on life and I personally commend him for his efforts. This is from one of your instructors.

**INMATE GARDUNO:** Yes.

**DEPUTY COMMISSIONER ARMENTA:** October 31st, 2006, Mr. Garduno has been a tremendous asset to the education department. He's a talented tutor for schools at all levels including college students. Admired by staff and students alike, Mr. Garduno is mature, responsible, trustworthy and reliable. A self-motivated individual. His (inaudible) positive conduct is a fine example for others and his pattern of exemplary conduct is very well deserving of respect. Then you got one from C. Spellman, sponsor of the (inaudible) AA. And you completed your 78th week chrono. But then we have one that supercedes all that. The 104 weeks. And another one from Spellman about enrolling at Coastline. You had a good GPA, 3.29.

**INMATE GARDUNO:** Yes, pretty good.

**DEPUTY COMMISSIONER ARMENTA:** Bet you never got that in high school.

**INMATE GARDUNO:** No, I didn't.

**DEPUTY COMMISSIONER ARMENTA:** If you had you probably wouldn't be here.

**INMATE GARDUNO:** I wouldn't be here, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** You've done well in college. Yeah, I really can see why you want to keep on going, because I know when you get over a 3.0 you feel good about it.

**INMATE GARDUNO:** Yeah.

**DEPUTY COMMISSIONER ARMENTA:** What kind of feedback do you get from the, the inmates?

**INMATE GARDUNO:** I get a lot of feedback (inaudible) especially (inaudible) try to get them involved in education in some type of (inaudible) GED, college, or some kind of (inaudible) but I get a lot of positive feedback, a lot of it.

**DEPUTY COMMISSIONER ARMENTA:** What do you tell someone that tells you that they, he or she, failed to get, he wants to pass the GED. What do you tell them?

**INMATE GARDUNO:** I found it possible, first of all, I found it (inaudible) needs some help (inaudible) spend some time on it and I'll help you out (inaudible).

**DEPUTY COMMISSIONER ARMENTA:** (inaudible) they need?

**INMATE GARDUNO:** What I do a lot of times is I sit down with the individual who (inaudible) I'll go over (inaudible) and see what they're lacking and where

they're lacking and try to help them out in that area.

**DEPUTY COMMISSIONER ARMENTA:** I, I used to work in that area many, many years ago.

**INMATE GARDUNO:** Yes.

**DEPUTY COMMISSIONER ARMENTA:** What I tell people now is just read, read, read, get to the eighth grade level or higher (inaudible).

**INMATE GARDUNO:** Yeah.

**DEPUTY COMMISSIONER ARMENTA:** Okay. And we have a chrono here from the chaplain. This one generated on (inaudible) is being generated on behalf of Inmate Garduno for the parole hearing. I have personally been able to observe Inmate Garduno's behavior and I have seen him as a respectful and well-mannered individual. He is really a constant source of inspiration to his peers as a leader in the prison community. He is a positive influence to others. Inmate Garduno's consistent with his behavior. He has been disciplinary free for 12 years. He is commended for his positive behavior. This is signed on 10/10/05. Then you have another one from Correctional Officer Milke, M-I-L-K-E.

**INMATE GARDUNO:** (inaudible) Yeah, okay.

**DEPUTY COMMISSIONER ARMENTA:** This 120 is being for a Board of Parole hearing. I have observed that Inmate Garduno conducts himself around staff and other inmates, he has a positive attitude and sense of integrity. He is welcome as a positive, turned around,

and for being consistent in good behavior. It is apparent he is on the right track. I personally commend you for responsible behavior. And, sir, we can go on and on all day with these type of chronos, you have a lot of them and many of them from, from staff. And that usually speaks very, very well. I think a lot of staff, am I right, do not write, do not write these chronos.

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** (inaudible) but you got a lot of different COs that write, that did write. Okay, is there any other chrono that you would like me to read? One that you really, you know, would like to put on the record?

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** Okay. So we talked about your school, we talked about all the positive things about you. Now let's talk about somebody who's negative. Positive in the sense that you have not received a 115 since 1993 and that was a fight. What lead up to this, something to do with racial fighting?

**INMATE GARDUNO:** (inaudible) confrontation with the cook.

**DEPUTY COMMISSIONER ARMENTA:** (inaudible) all your 115s had to do with fighting, huh?

**INMATE GARDUNO:** All except the first one, sir.

**DEPUTY COMMISSIONER ARMENTA:** The first one says

a, stabbing in cell. That's a fight.

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** 5/28/1991, stabbing in cell, and 12/13/1991, fighting, and 1/28/1992, (inaudible) altercation and 1/18/93, another fight, fighting involving race. You had one 128 and that is, the last one, 9/25/94 and that was excessive contact with a visitor?

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** So it's been 13 years since your last 115?

**INMATE GARDUNO:** Yes, correct.

**DEPUTY COMMISSIONER ARMENTA:** 13 and a half, going on 14?

**INMATE GARDUNO:** Correct.

**DEPUTY COMMISSIONER ARMENTA:** What, what made that, that turn?

**INMATE GARDUNO:** Actually what happened is --

**DEPUTY COMMISSIONER ARMENTA:** (inaudible)

**INMATE GARDUNO:** -- (inaudible) after 1992 (inaudible) change my attitude (inaudible) and I did, but (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** Have you been involved inside the prison in gangs?

**INMATE GARDUNO:** I wouldn't call it being involved, (inaudible) categorize (inaudible) because (inaudible) I would have been categorized.

**DEPUTY COMMISSIONER ARMENTA:** But you had, you had taken part?

**INMATE GARDUNO:** (inaudible) not participating (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** I guess you could say your first couple of years.

**INMATE GARDUNO:** Yes, that's correct.

**DEPUTY COMMISSIONER ARMENTA:** You stopped. Okay. All right. Let's go over your psychological report. Under diagnostic impression, under Axis I, history of alcohol abuse, in remission. Under Axis II, (inaudible) no diagnosis on Axis III. Axis IV is area of stress, it says the stress is related to life term incarceration. Gives you a overall assessment of functioning of 90, which is considered (inaudible) high level (inaudible) that's pretty high. It means that you can, you can function without major issues. Under assessment of dangerousness, section 13, the doctor writes the following: It is impossible to predict with scientific certainty that any individual will or will not be, will not reoffend. There are factors that seem to identify the probability of reoffending as well as the positive possibility of successful adjustment back into society without recidivism. If Inmate Garduno were released from into the community at this time, his propensity for violence would be expected to be similar to that of an average citizen. He would not be expected

to pose an increased risk to the public if he maintains his sobriety and remains distant from (inaudible) risk factors of (inaudible) environmental influences versus self-values stress-related to supporting a child, (inaudible) increase (inaudible) appear to have resolved, resolved or improved. He has matured, he has maintained contact with his supportive family. He is no longer married but is supportive of his sons (inaudible). He has replaced negative social and environmental influences with more positive religion (inaudible). In the prison population Inmate Garduno's propensity for violence would be similar to that of a level 1 inmate. He entered prison in 1991. During his initial adjustment period he was influenced by prison politics. (inaudible) he really did not know how to function in the prison. He became involved with negative influences. This is all documented by serious 115 disciplinary actions. Four 115s from 5/21/91 until 1/18/92. Inmate Garduno reports that he began to think about his family and his actions. He made the decision to change his thinking and to become a productive prisoner. In 1993, Inmate Garduno made a life-changing decision. He became a Christian and he gave my life to the Lord. Every person (inaudible) political forces on the yard. When he was transferred to Lancaster he improved. He came to Ironwood State (inaudible) no political problems. Is there anything else I haven't

covered?

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** Either the report or the post-conviction?

**INMATE GARDUNO:** (inaudible)

**DEPUTY COMMISSIONER ARMENTA:** (inaudible) back to the chair.

**PRESIDING COMMISSIONER BIGGERS:** I'm going to follow up on a couple of things. In 2003 in your psychological report, which was done by Dr. Dennis Payne (phonetic). He indicated that you had downplayed the gravity of the crime to a certain extent. Do you have any comments to make about that, sir?

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** In 2003, you were in fact downplaying the gravity of the crime?

**INMATE GARDUNO:** I don't think I was downplaying at any time the seriousness of the crime, but I was trying to have (inaudible) with respect to (inaudible) with respect to my past because of the way he was (inaudible) with respect to my job, my family, (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Okay, but, again, I'm just reading what the doctor said in 2003. In regards, and I'm quoting, in regards to the causative factors, the inmate said that he initially wanted to scare the victim. However, he justified his action by

stating that the doctor reported that the wounds were not life-threatening. Do you recall that sir?

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** And on the stabbing incident, were you the victim, or did you stab the individual?

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Okay, at this juncture I'm going to go into your parole plans and I see that you, you plan on staying with your mother and father, Gloria and Jose?

**INMATE GARDUNO:** That's correct.

**PRESIDING COMMISSIONER BIGGERS:** And they live in Hesperia, same as you did before?

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** And you plan on being employed by a Santana Concrete Construction Company in Julian, California? How far is that from Hesperia?

**INMATE GARDUNO:** Probably about a half hour, no more than 45 minutes (inaudible).

**PRESIDING COMMISSIONER BIGGERS:** And you also have some alternate employment plans with your sister, doing carpentry?

**INMATE GARDUNO:** That's correct.

**PRESIDING COMMISSIONER BIGGERS:** I did look at those pictures that you brought in and you are very

talented.

**INMATE GARDUNO:** Thank you.

**PRESIDING COMMISSIONER BIGGERS:** And I see that you do have some skills, I mean, so you do have some marketable skills. I'm going to now look at your, read your support letters, and there are quite a few support letters here. The first one is dated September 15th, 2006, and that's from Pricilla Garduno.

**INMATE GARDUNO:** Yes, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** And she is your sister-in-law.

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** Okay. And she's told us about her visits and speaking with you on the phone and she's (inaudible) optimism that you have toward the future and that you're a warm and compassionate person. I have a letter from a Dr. (inaudible) Garduno.

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Is that your brother?

**INMATE GARDUNO:** Yes, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** And he looks towards (inaudible) role in society and you're a very close-knit family and you're all involved in keeping (inaudible) hope you will transition soon. He talks about how you have obtained your GED and associate

degree and hopes that you will go on with your religious studies.

**INMATE GARDUNO:** That's correct.

**PRESIDING COMMISSIONER BIGGERS:** He's currently a naval officer and recently graduated physician, assigned to the Naval Hospital in Balboa in San Diego (inaudible)

**INMATE GARDUNO:** Yes, that's correct, sir.

**PRESIDING COMMISSIONER BIGGERS:** The next letter I have is dated October 25th, 2006, and it's from a Jesse Santana. It's from Santana Concrete, Incorporated, Bloomington, California. It says you'all have been friends since 1985, we met when we worked together in the Carlos Construction Company and that you worked on a consistent basis and were one of the hardest working, dedicated crew members. And he talks about your degree and he's going to offer you as a cement finisher at the rate of $22 an hour. I have another letter dated November 14th, 2006, from a Mr. Armando, from a Jacqueline Garduno and that's your sister?

**INMATE GARDUNO:** Yes, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** Says she's been incorporated for probably 16 years as a (inaudible) also working at real estate as a part-time job and would love for my brother to become my partner and she said that (inaudible) influenced by the Lord and being the best brother you can be. I have a letter dated November

14th, 2006 from Jacqueline Garduno, she's vice-president of Artista Talents, your sister?

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** And would be more than happy to see my brother here in my company. (inaudible) position that we have available. Now I'm going to a letter that I received today, usually (inaudible) by the way. I have a handwritten letter dated August 15th, 2005, thanks for your letter, it's always good to hear from a fellow AA, especially behind the walls and keeping sober. This is from, I can't read that name of, Ray (phonetic), B-O-Y-E-T-H?

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** It's, it looks like Boyeth, anyway, it's a letter from him dated 8/15/05 and he sent you some information on AA meetings. I have another letter dated November 9th, 2006, from, from one, two, three, four, five, six, six individuals who (inaudible) willing to offer their homes, transportation and any other items you may need to establish yourself. Jose and Antonetta Garduno, (inaudible) and Holly Garduno, Frank and (inaudible) Cordell, Pete and Linda Hudson, Aguilar and Pricilla Garduno and Jacqueline Garduno, all in one letter, November 9th. I have another letter dated November 1st, 2006, from Josephina Garduno, she's a translator, and translated by Linda Hudson. I guess she's --

**INMATE GARDUNO:** Yes (inaudible) that's correct.

**PRESIDING COMMISSIONER BIGGERS:** It says my name is Josephina, I understand that Armando may be deported to Mexico. I didn't see that you were on a INS hold.

**INMATE GARDUNO:** (inaudible), no.

**PRESIDING COMMISSIONER BIGGERS:** And she's just saying that if you were deported that she could offer you a job (inaudible). This one is from (inaudible) Garduno, she's an elementary school teacher and she's your sister, and she indicated that (inaudible) can and will provide financial, emotional and spiritual support as well as living accommodations for as long as my brother needs. Credentialed teacher (inaudible) this one was also translated by Miss Linda Hudson and it's dated October 31st, and it's from Laura, is that your sister as well?

**INMATE GARDUNO:** That's Laura, my cousin Laura.

**PRESIDING COMMISSIONER BIGGERS:** Cousin.

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Would be happy, and he can stay with me. (inaudible) here in Mexico. I have another dated September 10th, 2005, and it's from (inaudible), and that's from your brother, is that the same one I read earlier?

**INMATE GARDUNO:** It might be (inaudible).

**PRESIDING COMMISSIONER BIGGERS:** Well, just to make sure, and he said (inaudible) see if we can turn my

nephew from (inaudible) and he talks about your work and (inaudible) that's the one I read earlier. This is one that he (inaudible) went to Balboa Hospital. And I have another one here that was dated November 14, 2006, Jacqueline Garduno, said that she's been working real estate, yeah, I read this one already, and said she wants you to be a partner. Yeah, this is the one from (inaudible) I've read that one. Her's another one from Jacqueline dated November 14th, 2006, it's the same one that I read earlier. There's another one from (inaudible) I've already read. There's the one from Jesse Santana that I read earlier.

**INMATE GARDUNO:** Yes.

**PRESIDING COMMISSIONER BIGGERS:** There is another letter dated January 18th, 2006, from Santana Concrete Company, Santana Concrete Construction and it's also by Jesse, this is just a later date, the first one was January 18th, 2006, this is an updated one October 25th, 2006. Basically it said the same thing. Said that they have a job for you, that he owns the company and what they specialize in doing and he's going to pay you at the rate of $22 an hour. And this is from (inaudible) Photo, Incorporated, Steve Hudson's the manager, dated October 31st, 2006. This is one from your brother-in-law. And he is (inaudible) earlier, this one is updated (inaudible) California (inaudible) I just think it would be much better for everyone involved

that he become a productive, honorable, tax-paying citizen and he also says that you have a place to live and work with him. This is a letter dated September 15th, 2006, and this is from Pricilla, and she's saying, (inaudible) this is another one that I read earlier. This is another letter from Linda Hudson, I read that one already. And this is the one I read from the doctor. Here's one from your younger brother, Geraldo, that I have not read, dated November 9th, 2006. He's 26 years old, he's currently (inaudible) and a civil engineer, he spent four years in the United States Navy. As well, he's been a good brother and law-abiding citizen. (inaudible) positive influence in those (inaudible) and this is another letter dated November 9th from Holly Garduno, who is your sister-in-law and she's (inaudible) she's saying you're no longer a criminal in her eyes and paid more than enough for your mistake. And (inaudible) granted parole you'd never come back to prison. This one is dated November 10th, it's from Jose. My name is Jose and I am the father of the inmate. He's 67 years old and I'm not in the best health. (inaudible) believes in God and (inaudible) the Lord. I have no doubt my son would be a good law-abiding citizen if he's let out. I have a letter dated November 4th, 2006, from Sylvia Garduno. Saying thank you for (inaudible) consideration what I have to say about my brother. You've grown a lot in 15 years and no

longer is he the same person that he once was (inaudible) helping those around you. Another letter dated November 10th, Antonetta Garduno, she is saying that she's the mother, she says her health is diminishing and she does not know what the future holds. I do know what little time I have here I would be spending with my son. My son has made some mistakes in the past (inaudible) good person now and she said she loves you and will do anything she can to make sure you're a good citizen if you're let out. And this one, again November 9th, 2006, from Umberto Suarez, he's in (inaudible) Mexico and if you were to be released (inaudible) Mexico, you can stay with him. I sincerely hope that my nephew will be released to his family in California. Sir, I believe that's all of the letters that I have, did I miss any?

**INMATE GARDUNO**: (inaudible)

**ATTORNEY BUCHALTER**: May I speak to that?

**PRESIDING COMMISSIONER BIGGERS**: Yes, please.

**ATTORNEY BUCHALTER**: Did you read an Ophelia Garduno, his sister, correct?

**PRESIDING COMMISSIONER BIGGERS**: Yes I did.

**ATTORNEY BUCHALTER**: What about Eddie and Frank Garduno, nephews?

**PRESIDING COMMISSIONER BIGGERS**: Yeah, I did that too.

**ATTORNEY BUCHALTER**: You did that, where am I?

John and Farrah Fentress (phonetic)?

**INMATE GARDUNO:** Fentress.

**ATTORNEY BUCHALTER:** Fentress, 30 years in law enforcement and wrote letters of support.

**PRESIDING COMMISSIONER BIGGERS:** I didn't see that one in here.

**INMATE GARDUNO:** It's in here.

**PRESIDING COMMISSIONER BIGGERS:** (inaudible)

**ATTORNEY BUCHALTER:** (inaudible) Otherwise I think we're good.

**PRESIDING COMMISSIONER BIGGERS:** (inaudible) brother (inaudible) I don't see anything in there about law enforcement. I'll go back (inaudible).

**ATTORNEY BUCHALTER:** Are you finding yours? (inaudible) Did you find it?

**INMATE GARDUNO:** It should be right here.

**ATTORNEY BUCHALTER:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** No, I don't have that letter.

**ATTORNEY BUCHALTER:** We're looking --

**PRESIDING COMMISSIONER BIGGERS:** Maybe (inaudible) I'll see if I can find (inaudible)

**INMATE GARDUNO:** It's right here.

**ATTORNEY BUCHALTER:** Oh, you got it? Oh, I got it, and it's got hole punched so it came in my packet, so there you go.

**PRESIDING COMMISSIONER BIGGERS:** Okay. This is

a letter, it's dated (inaudible) John and Farrah (phonetic) Fentress, F-E-N-T-R-E-S-S, dated January 29th, 2006. Says he's a 30 year old retired police detective from the city of El Monte, also a member of the (inaudible) Chapel, (inaudible) come to visit (inaudible) meet up with the inmate. I feel that after working in law enforcement for 30 years (inaudible) obvious change (inaudible) I feel that the inmate is a changed man (inaudible) and, again, that's from John and Farrah Fentress.

**ATTORNEY BUCHALTER:** And we found one more.

**PRESIDING COMMISSIONER BIGGERS:** This one's from Anna and Jesse Nunez, N-U-N-E-Z, dated June 20th, 2006. Think about (inaudible) on behalf of my nephew, full time employed mother of two, my husband is a full time construction worker. They talk about your achievements and your AA degree. (inaudible) nephew the opportunity to be with me and my wife, my family would be glad to do so, be very supportive of him financially and spiritually, we'd (inaudible). Okay. Any more?

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Okay. Well, I'm going to -- there are some here in your file, I just want to make sure that I go through and get them all in. There is one, September 15th, 2005, but that was after last year and (inaudible)

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** Okay. This is from the Praise Chapel Christian Fellowship in Victorville; we at Praise Chapel, located in Victorville and services on Sunday morning (inaudible) and that's the one from the AA guy again. I believe that I have them all. Okay, one more, go through and insure that (inaudible). I think I have them all.

**INMATE GARDUNO:** It's not here(inaudible) it's my brother's letter?

**ATTORNEY BUCHALTER:** (inaudible)

**INMATE GARDUNO:** (inaudible) from Frank (inaudible)

**ATTORNEY BUCHALTER:** You did read part of two letters, that was Eddie and Frank both?

**PRESIDING COMMISSIONER BIGGERS:** Yes I did.

**ATTORNEY BUCHALTER:** Oh, yeah, thank you.

**INMATE GARDUNO:** (inaudible)

**PRESIDING COMMISSIONER BIGGERS:** (inaudible) Balboa and the other one is a --

**ATTORNEY BUCHALTER:** College student.

**PRESIDING COMMISSIONER BIGGERS:** College student at Sequoia (inaudible).

**INMATE GARDUNO:** (inaudible)

**ATTORNEY BUCHALTER:** That's it.

**PRESIDING COMMISSIONER BIGGERS:** (inaudible)

**INMATE GARDUNO:** Yes, that's correct.

**PRESIDING COMMISSIONER BIGGERS:** I also have an

opposition letter from the Fontana Police Department. Dated October 25th, 2006, and it's sent from a Larry J. Clarke, Chief of Police, Fontana Police Department. October 19th, 1990, and he was driving a vehicle with another gang member when we saw Armando Garduno, member of a rival gang, walking down the street. The inmate turned at the first intersection past (inaudible) short distance and then switched places so that he was the passenger in the vehicle. They drove back to the area where they had seen Guerrera and the inmate saw him walking through a field so he instructed the driver to stop. The inmate exited the vehicle with a double barrel 12-gauge shotgun. He approached Guerrera on foot in the field and words were exchanged in which each claimed gang loyalty. The inmate raised the shotgun at the unarmed Guerrera who immediately turned and tried to run. The inmate fired once striking the victim in the back of the legs and knocked him to the ground. He then approached the victim on foot, pointed the shotgun at him. When the victim tried to crawl away he (inaudible) over the victim and he fired another round. Apparently at the last second was struck in the arm, leaving him alive and damaged for life. The inmate had (inaudible) scene. The inmates actions were clearly cool and calculated, particularly the way he stalked the victim as he was virtually helpless. His actions clearly demonstrated his lack of concern for the life of others.

Inmate exhibited the type of callous, intentional criminal behavior that is beyond rehabilitation. While he has (inaudible) with the shotgun, allowing the victim to survive (inaudible) excuse me, intended execution. The chief of police with the Fontana Police Department is adamantly opposed to release of a cool, calculating menace such as the inmate. Thank you for the opportunity, Larry J. Clarke, Chief of Police, Fontana Police Department. That was the only letter of opposition. I do have the district attorney from San Bernardino County here, who I would ask at this time if he has any questions about the inmate?

**DEPUTY DISTRICT ATTORNEY MOTIKEIT:** Well, thank you for reading Fontana Police Department's thoughts into the record. Chief Larry Clarke was, was involved in the investigation, I happen to know, and that Fontana takes any crime that happened, happens in their city very, very personally. At this point in time, I just recently transferred out of Fontana and happen to personally know that there are probably close to 100 criminal street gangs in that area. It's a very violent place. Actually, the pallet yards, I had the distinct opportunity to prosecute and convict a murder that occurred in the San Bernardino pallet yards. He, which is serving 25 to life at this point. What we have is, we have a person who, at that point in time was a member of a criminal street gang. He had committed offenses

prior to that, the committing offense, so that was an aggravation. He was, belonged to a criminal street gang, so that, that is also a factor in aggravation. He personally used a firearm in this case which is a factor in aggravation. The bottom line being an unreasonable risk of danger to the community. He personally inflicted great bodily injury and as Chief Larry Clarke very aptly points out the fact that, that were it not for the last second withdrawal by the victim in his own defense, he would be dead now instead of permanently left a cripple as a result of this. The heinous nature of this crime is evident to all present here. What we have is the inmate disabling his victim and then going up, attempting to do the coup de'grace shot. The only thing that ended the altercation is the fact that the inmate was out of ammunition at that point in time and withdrew. Clearly, clearly since 1993 there has been an adjustment in the behavior of Mr. Garduno. He is performing well in an institutional setting. It is Fontana Police Department's opinion and it's the opinion of the district attorney's office of the state of Cal-, San Bernardino County, that an institutional setting is the appropriate setting for Mr. Garduno. When he committed that crime and his intentions were carried out almost to the letter, he joined a very private club. It's a private club of people that do heinous and atrocious acts in their lives. And it's Fontana Police

Department's perception that he is beyond rehabilitation as a result of committing this crime. And it is a very strong argument that can be made to that fact. The fact that if you're capable of doing something like that, on a whim, with that degree of violence, with that degree of gang membership, personal use, he started it, there's no question about it, he started it, they came back, switched places so he could be the shooter. When you're shooting somebody with a shotgun it's a lot different than any other crime you can commit. When you're standing over somebody getting ready to give them the coup de'grace, that's an intent to kill. That's why we have the attempted murder and the personal use allegation in this case. The psych evaluation is somewhat good for the inmate but it says, well, he could be a productive individual if he stays away from the booze and drugs and no gangs. Well, that's a big if. We have letters from people that are saying, well, he's great and these are people that don't know him. These are people that used to know him or they're people that know him in the institutional setting. If somebody wants to get out of Ironwood, if they want to get out of the system altogether, they know what the rules are, they know what the game is. The game is to get a bunch of letters of people from vast arrays of in the community or outside of the community, the relatives and do a campaign like that. Maybe these people don't know

who this gentleman's going to be should he be awarded a release today. Fontana Police Department recognizes the fact, and it's a sad fact, that some people are beyond rehabilitation. I don't know if Mr. Garduno is beyond rehabilitation. But he clearly hasn't reached that point at this time. He behaves well in an institutionalized setting, that's where he needs to be. He hasn't been here nearly long enough. He's doing fine with the 115s, he needs to stay here and do better. Thank you.

**PRESIDING COMMISSIONER BIGGERS:** Okay, thank you, sir. Counselor?

**ATTORNEY BUCHALTER:** Thank you Commissioners. I would like to first of all address a couple of remarks the district attorney has stated about the opposition letter. First of all he talked about, he got a conviction of somebody for 25 to life and 100 criminal street gangs in Fontana. I don't believe that bears on my client's suitability one way or the other. When he talks about he's beyond rehabilitation, I don't believe that the law contemplates that at all. I believe if that were the case he would have gotten life without parole, which I don't think was available. So, also, I noticed in the opposition of the police department, the police chief, he only discussed the facts of the life offense, he certainly did not discuss any of the rehabilitative information that we have put forth here

today, which is why we are here. It's about his rehabilitation. Also, there's a law now that tells you that the district attorney's opposition is not a factor of suitability, it is just that, opposition, and the same would apply to the police chief. And the district attorney pointed out, he used the word opinion, I would agree with that, it's his opinion and that's the police chief's opinion, and the police chief, of course, did not discuss any rehabilitative efforts. He did not weigh the crime and I'm going to speak about the crime shortly, but I would ask you to keep it in that context, if those are (inaudible) opposition, it's just that, they're in opposition. As you know we're here about rehabilitation, so to say he's still not, he can never be rehabilitated, I think, is a -- it flies in the face of logic and it flies in the face of the rehabilitative efforts of the California penal system. In fact, Governor Schwarzenegger and other political leaders joined together to state that rehabilitation was the new focus of the California penal system, they even changed the name of the institution to include the word rehabilitation. So to say that he's not, can never be rehabilitated, I think, defies the face of logic, frankly. So, we have society demands that he be punished. He's had his punishment, they're never going to hear about his rehabilitation. There is a presumption of release, Commissioners. The Supreme

Court held in 1979, and reiterated in 1987 that "a state statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when, all the certain designated findings are made and thereby gives rise to a constitutional liberty interest." See also the case of the *McQuillen* (phonetic), I have the cite if necessary. He also, the *McQuillen* case cited the *(inaudible) v Inmates of Nebraska*, and I have that cite as well. They cited another case, *The Board of Pardons v Allen*, in concluding, the Ninth Circuit has held that California's parole scheme does create a recognizable liberty interest in release on parole, because Penal Code section 3041 uses mandatory language. So, there is a presumption that he will be released unless there is some overwhelming finding that he remains a danger to society. I believe you have the (inaudible) Correctional Counselor regarding his (inaudible) it's the caseworker's opinion, however, that he's being honest and truthful in stating he's not a gang member. I don't believe that's an issue, I believe it's very clear that he is in fact not a gang member. His support is amazing. You were very thorough, thank you, Commissioner, on that. The, I just want to recap that, he has over six residences to live in California. Three or four residences in Mexico, but there won't be a problem there, I'm sure, because he doesn't have an INS hold. He has three or four job offers in California.

He has seven who have offered him all financial support, and he's also got his marketable skills that you've talked about. So, what is interesting to me is when the district attorney said more than once that all those letters, people just drum up and they don't even know him. Well, I think about 20, there are 20 letters and (inaudible) about seven of them offered all financial support, from people who don't know him? I would find that to be very suspicious. And I think he must not have listened, because all of those people are his relatives. They're uncles and aunts and cousins and brothers and sisters, of which he has a number, his mother and father. So, it's not true that they don't know him. Those support letters, I think, speak for themselves. As far as AA goes, he will take care, as you know, he even has now a list of the places of the places, of the meeting places because he understands that his sobriety is very, very important and he has already written to the AA and received the locations. And he has the letter with the maps, he's got the maps, and the dates and the times of the meetings because that's going to be his biggest priority on the outside. He understands that. His programming has been so excellent, of course, he got his GED, the tutoring program and the self-help; the most important thing is the sobriety and he attends NA and AA, as you know. He did the peer education for infectious diseases, he did

the rehabilitative therapeutic techniques training, the breaking barriers course, effective communication training, he's had, done, anger management, victim impact awareness, stress management, effective decision making, and also other things he did -- he worked with the family radio school of the Bible, which is a moral guideline for him, that was a course which he earned 45 units and got a 4.0 average, by the way. He also took a college course in speech and got a 4.0 average. And you've seen his art work and the word talented was used by me and by you, Commissioner, I believe and I believe that his work is exceptional and he can do that on the outside too. I would like to comment on his staff's comments on "he went through a lot." I won't repeat what you said, Commissioner, when you spoke about them, but I want to add that the staff who know him and work with him, interact with him, all these years, also add, I'm gonna add to what you said -- open and honest, positive influence, a responsible individual, is an excellent candidate for parole, takes full responsibility for his actions, carries himself well with staff and other inmates, good influence on young inmates, has done an outstanding job of making a positive turnaround in his life, he has matured, is consistent in his positive behavior, always reliable, punctual and ready to work, he has a strong motivation to learn, he's a great asset, he has consistently shown

himself to have a commitment to good character, and I believe that shows through. And I believe that's the part of the rehabilitative system and I believe that's the part of why, the fact that he should never be paroled does not work. As far as his priors, they were a very long time ago, 1988, 17 or 18 years ago, and Title XV contemplates that serious and violent felonies are to be used as prior conduct to be considered. These were not, these were both misdemeanors, by the way; one was a misdemeanor battery that was a beer bottle thrown with four people and the other one was DUI. So those don't, 17 and 18 year old misdemeanors do not show an escalating pattern of criminal conduct that requires more imprisonment for observation. There is also (inaudible) category of just relics and nothing more, they have no weight, nor any bearing on his unsuitability, or it, it doesn't weigh towards that. If anything goes to his 115, he talks about that, they were a very long time ago, also, and he talked to you about how he brought that behavior into prison in 1991 when he got his first one, two of them in 1991 and then in 1992, and 1993. In 1993, that's when he turned himself around and that's been 13 years now of having turned himself around without any disciplinary on his record. They are 13 and 15 years old and consistent with the life offense law that I will be going over shortly, are diminished. They are so diminished that they have no importance or

use. They are no longer sufficient to support a denial of parole. They cannot possibly outweigh the past 13 years of outstanding conduct. The prior decisions, I want to go over this just a little bit, Commissioner. In his denial in 2004, the commission stated that "of course, the first thing we can say was the commitment offense." I'm going to talk to you about that in a moment. They also discuss a new psychological report, which, of course, we now have and it is favorable for a grant of parole, and I will address that, also, shortly. There's a great deal of new case law about how you use the gravity of the offense to keep someone in prison for longer observation. The *Irons v Warden of California State Prison in Solano*, I have the citation if necessary, talks about the word trivial. The motive, it rules that the circumstances of petitioner's crime and motivation are not going to change. "The circumstances of the crime will always be what they were and the inmate's motive for committing them will always be trivial." So, therefore, an inmate has no hope for ever obtaining parole except that perhaps, the court says, in the future, the panel will arbitrarily hold that the circumstances were, after all, not that serious or the motive not that trivial. Given, that no-one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole then becomes remote in time and arbitrary, so the word trivial is

applied to everything; the crimes, the court says, are always trivial, therefore that would convert into an illegal sentence of life without parole. If you were to say, well, it's a trivial motive therefore we're not, we can't give him a parole. The, there's a word called atrocious also that's often used when denied, say the crime's atrocious. The court has recently ruled on that also, in October 16th, 2006, there's a new case, the *Wen Lee* case, W-E-N L-E-E, two words. The court spells out what atrocious means as it relates to suitability or unsuitability findings. Atrocious, the inquiry, the court states, is "whether among murders" and, of course, this is not even a murder, but an attempted murder, the one committed by Lee, for example, who was particularly heinous, atrocious or cruel and then the *Lewis* case speaks to that also. By this measure, the court said, the *Lee* court rules Lee's crimes were more commonplace than egregious. The court articulates that crimes that constitute atrocious, and this is a published case, current law, that they mean, and they mean the kind that you compare the word atrocious to -- the Rosencrantz killing, the Dannenberg (phonetic), McClendon, (inaudible), the Van Houten/Manson killers, the (inaudible) and Lau; those are the crimes that you can use the word atrocious to. Therefore this particular crime cannot possibly have the category of atrocious for which he needs a longer observation in the prison

system. The, also the court points out, and this is the *In Re Scott*, to support another decision, that the past crimes value for predicting future crime diminishes over time. But law enforcement and the district attorney did not acknowledge that the passage of time makes a big difference in predicting future behavior. The word callous, also, the court has now addressed the word callous for the board, for the panel, for parole hearings in California. The *Lee* case also talked about what does callous mean and how can you use it to, as the gravity of the offense to keep someone continually locked up. The court, on page 9 of that opinion notes that the *In Re Scott* case also holds that all second-degree murders, by definition, involve some callousness, i.e., lack of emotion or sympathy or emotional insensitivity. I'm sure that we can also, by comparison, compare this attempted murder the same way. All of them have lack of sensitivity and emotional sensitivity, and lack of sympathy; all of those crimes do. And that makes a big difference. The indifference to the feeling and suffering of others, that's callous, and all of the crimes certainly have some element of that in their, in their composition. The court then compared the *Lee* crime to that of the *In Re Smith* crime and the court said that yes, the crime was callous, they are all callous. So the court goes on to rhetorically ask itself are the facts of the crime some evidence that

Smith acted with the victim's, acted with exceptionally callous disregard for the victim's suffering. So exceptionally callous is often used in the denial of parole in parole hearings. And the court now, in October, has now addressed the word callous and how it can and cannot be used any more. They say that exceptionally callous disregard for the victim's suffering, or do the facts distinguish this crime from other second degree murders as exceptionally callous versus callous? The court rules that the answer is no. The attempted murder crime, for example, this one, is not exceptionally callous, as the courts have held that all life crimes are callous. The question is, is the crime exceptionally callous. In this case the answer is no, because the court tells us what exceptionally means. The *In Re Smith* court said that a determination that the crime was cruel or callous must mean that it was perpetrated in an exceptionally and cruel manner or with exceptionally callous disregard for human suffering and that would mean, they say, that the inmate tormented, terrorized or injured the victim before deciding to shoot the victim. There's no evidence that Mr. Garduno tormented, terrorized or injured the victim before deciding to shoot the victim. Therefore, this case cannot be labeled exceptionally callous as a matter of the new law. They also, the (inaudible) case, the diminished use of the gravity of the offense prohibits

the board from relying on the gravity of the offense to justify denial of parole other than initially. The court in the *Rosencrantz* and the (inaudible) cases also hold that after years of rehabilitation the ability to predict prisoner's future dangerousness based simply on the circumstances of his or her crime is, and I'm gonna quote, "nil, N-I-L." The court said. You can also see *Irons* 358, F.supp, S-U-P-P, 2nd, at 947, for the same acknowledgment that for the crime, the value of it predicting future behavior is nil. My client is an exemplary and model prisoner, Commissioners, in every respect and the *Rosencrantz* case, also, has mandated that the life prisoner's due process rights require that the board consider and weigh all favorable evidence, that is something that the district attorney and the law enforcement officer, the chief of the police, did not do in their letter. They did not weigh, consider, all the favorable evidence, they just said let the life crime be the factor that you base your denial on if you deny him. The case called *Capistran*, C-A-P-I-S-T-R-A-N; I have the site for that also, it's a 2003 case, and the *Rosencrantz* (inaudible) all hold that the constitutional requirement of "some evidence" does not mean literally any evidence, Commissioners. And therefore there is no evidence that my client poses an unreasonable risk of harm to others if released, the evidence is overwhelming that he's not a danger to society when you weigh and

consider all the favorable evidence as required by the new case laws. He has accepted responsibility from the beginning and he turned himself in after a few days and said I did this, and he was arrested and sent to prison for that. The, he will speak to his remorse shortly, when he has a chance to speak with you. He, the doctor said also, Dr. Smith also said he has remorse for what he did. And that's, that's important because remorse can show that the individual who has the remorse has some self-transformation capacity and thus is more likely to be rehabilitated. And this reflection and introspection is an aspect of rehabilitation. That's why it's a consideration in this kind of a hearing. The psychological reports are favorable. The 2003, by Dr. Payne, is, his, the one negative, which he just said he downplayed the crime. That does not make my client unsuitable, the fact that the doctor felt he didn't speak fully about the life offense to him, and so therefore he gave him an assessment of downplaying the crime. That's not a factor that can have any possible weight or bearing to find him unsuitable based on that, that particular one. Because that would be the only unfavorable thing in his entire record that we presented here today and that certainly is in (inaudible) excellent records, as a matter of fact, and is -- and in nowhere, by the way, does it say every psychological report has to be favorable. So to say that it's not

favorable is not a factor of suitability in California law. The psychological report, by Dr. Alon (phonetic), 2001, two years prior to Dr. Payne's report, he's an M.D., psychiatrist, he wrote, "if (inaudible) community, the inmate probably should not present a problem to society, it is this examiner's impression that during institutionalization this inmate has matured constructively, he is likely to hold present gains, he has adequate impulse control." To the current report, and this is almost my last comment, Dr. Smith, I believe, has said it all. Because she answers the one question that we are hear to answer today, which is if you let him back to the community, into this amazing family that he has, wanting to welcome him back -- they're amazing citizens, if you've noticed. They, the one question if we let him out does he pose an unreasonable risk of harm to others. Dr. Smith answers the question; if Inmate Garduno were released into the community at this time his propensity for violence would be expected to be similar to that of an average citizen, in other words, similar to mine, Commissioners. He would not be expected to pose an increased risk to the public if he maintains his sobriety and remains distant from any gang related associates. That will be the case, Commissioners. "He is responsible for his actions. If he has solid living arrangements and is gainfully employed, he is not expected to present a risk

to society if he maintains his sobriety and does not associate with any gang related individuals." She writes he has benefited from this incarceration and has sought rehabilitation. It appears that this inmate has fulfilled the goals and recommendations for the Board of Prison Terms, that is very much a clearly recent report. When you weigh all the favorable evidence against the diminished use of the life offense, which is now that old, Mr. Garduno does not pose an unreasonable risk of harm to public safety, Commissioners. Multiple courts have held that after so many years the crime, the weight or the value of it to predict future behavior is, and I repeat, nil. It doesn't have enough weight to overweigh all of the overwhelming evidence that was presented today for his, to show that he is a fully rehabilitated person and his sentence says he deserves to go home. He has laready (inaudible) eligible parole date, already, by about five years. He deserves a grant of parole today, Commissioners, and any contrary conclusion, in my opinion, lacks any evidentiary support. Submit.

**PRESIDING COMMISSIONER BIGGERS:** Thank you. Sir, you have the opportunity to tell us now why you feel you're suitable for parole.

**INMATE GARDUNO:** Thank you, Commissioners. Commissioners, I want to start my comment by saying that (inaudible) from various individuals will attest to that (inaudible) I know that I can never change the past, but

I know that I have changed the present and in doing that, the future also. I believe that I have become a positive part of the solution to society and my experiences can help (inaudible) and that I can contribute (inaudible) go from being (inaudible) I myself am also a father, I feel the (inaudible) and helping others. (inaudible) my parole plans are well established and I can provide for myself (inaudible) from my siblings (inaudible) will also continue to pursue. My family offers me a community support system. I plan to live with my mom, with my mother and father in Hesperia, where they are retired and are enthusiastic about having me there. The rest of my sibilings are (inaudible) professionals who are eager and willing and able to help me succeed in society, and even pay my way through college. I am (inaudible) opportunities that presented themselves (inaudible) my life in (inaudible) After an adjustment period when I was first incarcerated I made the changes in my mind and realized that I had (inaudible) pursuing opportunities that presented themselves and change my life in a better (inaudible) I attended school and completed my GED, I completed my GED and earned an AA degree in liberal arts. I am awaiting a secondary degree in religious studies at this time (inaudible) ministry. I also successfully completed training in two vocational trades including (inaudible) I yet I have not focused only on myself. My interest in

helping others has become a strong component in my life. I am now a certified master peer educator and (inaudible) I have provided tutoring for (inaudible) pre-GED and college students (inaudible) institution. I have successfully completed the (inaudible) provide spiritual support for others, primarily in conjunction with our Christian fellowship. In addition I have been, and will continue to be (inaudible) most recently in the past as chairman of our group. My intention upon release is to continue to strengthen my ties with AA and NA, not only attending meetings, but also by having a sponsor, by being a sponsor and by serving in leadership positions as needed. I understand very well the extreme importance of sobriety and wish to continue to share with others this understanding. In closing let me say that if rehabilitation is a goal in the California Department of Corrections and rehabilitation is (inaudible) please afford me the opportunity to demonstrate that success by my contributions to our society. I will not be a disappointment to you. Thank you. "23" inaudibles in closing statement.

**PRESIDING COMMISSIONER BIGGERS:** (inaudible) deliberations at this point.

**R E C E S S**

--o0o--

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**PRESIDING COMMISSIONER BIGGERS:** Okay. All right. In the, let the record reflect that everyone that was in the room prior to us going into deliberations is now back in the room. Mr. Garduno I have some good news and some bad news. I'll give you the good news first, we have a split decision. And the Deputy Commissioner Armenta voted for a date and I voted against giving you a date. And here are the reasons why I voted against giving you a date. First of all, I feel that the crime was carried out in exceptionally callous disregard for human suffering in that you shot the individual twice, Mr. Guerrero, twice. The first time that you, that you fired at him he went down. And you walked up to him and fired at him again. And I feel, from just looking at the record and the record is showing that -- it demonstrated to me that he was begging you to stop shooting, not to shoot him again. And, you pointed the weapon towards his face and he threw his arm up and that if it hadn't been for that you would have shot him in the head. I also looked at the, I know it's a small (inaudible), I went back and that's what took us so long, to go back and look at the psychological report. But I also (inaudible) psychological report and I feel that it was

very trivial based on what you said in that 2003 report, indicating in regard to causative factor the inmate said he wanted to scare the victim. However he justified his actions by stating that the doctor reported that the wounds were not life threatening. (inaudible) reaction were completely out of proportion to the (inaudible) and to me that shows that it's (inaudible). It could of easily been, you could have (inaudible) angry about it and it was also really noted that, you know, it was gang related. I also took into consideration your somewhat unstable social history of quitting school when you were in the 10th grade in order to go ahead and earn money. Your association with gang members, I'm not saying that you were part of a gang, but your association with gang members. Your record of violence both in and out of the institution, because you did have a misdemeanor in 1988 and then in 1991 you were involved in a stabbing assault while you were incarcerated. Which, by the way (inaudible) not gang related, it appeared that you two had a personal grudge against each other (inaudible) and then the other two fights, physical altercations, that you had. I know it's been a long time, but those are the primary factors that I had and reasons that I indicated that I didn't find you were suitable at this point. You have programmed well, you have programmed exceptionally

well, there's no doubts you have a great support system. You've got exceptionally good parole plans and you would be going back, you know, to a family that's there to support you. And, you know, everybody stood by you, but at the same time they were also there for you earlier and you did not take advantage of that or else you would not have been involved in all of these other types of, of situations, when you had all of that support available to you. And granted, you know, at 16 or 17 years old, and I realize that the crime was committed at age 20. I still don't feel that, I don't feel comfortable in going -- after Deputy Commissioner Armenta tells you why he feels that you are suitable, then I will go back and tell you what the procedure will be following this (inaudible).

**DEPUTY COMMISSIONER ARMENTA:** Mr. Garduno, in hearings we often say and comment and the case law and everything argued that we can't change the crime. We cannot change what's happened and you can't change it, the only thing you can do is change the result, who you are. There is also remorse, that's a word that's used a lot, and it's very important to us. (inaudible) to see action on the part of the inmate (inaudible) your case and positive action in being part of the remorse procedure. Part of the repent, you're sorry, and this is what I'm doing now to show you that I can do it. I

did wrong, I did all these things wrong and that's what I see, you did some bad things, that's why you're here. Yeah, and I can use that, you know, you shot this man once, you shot him again and by some fortune he didn't die. And, but that's, you know, that's done. We cannot rewrite the script. But you have written yourself a very positive script and what I took into consideration was that you had no juvenile record of assault (inaudible). While in prison you have enhanced your ability to function within the law upon release. Your participation in education programs, you got your GED, you got an AS degree through self-help. You've been involved in AA, NA, you've been involved literacy, in peer education where you're just not involved in self-help for yourself, but you're involved in helping other people. That is commendable. You've been involved in vocational programs. You did complete some vocations. Then, also, I see that because of your maturation, your growth, your understanding of (inaudible) has reduced the probability of recidivism. You have realistic parole plans, which include a job offer and family support, (inaudible). You have maintained close family ties while in prison via letters and visits (inaudible) parents come see you.

**INMATE GARDUNO:** Yeah.

**DEPUTY COMMISSIONER ARMENTA:** Again, I think I

heard at least twice a year they come. You have maintained your positive institutional behavior, which indicates significant improvement in self-control. Yeah, we can argue, I could have argued about your 115s, and they were terrible 115s, they were 13 years ago. They were terrible, you know, and fighting, they were a continuation of your behavior from outside. But, you stopped. You stopped. You showed signs of remorse. I think your programming shows that, aside from your psychological report. And most important to me was the positive chronos you received so many staff members. We can always, people can always argue that you can program your own family to write you certain letters. You know, writing one letter and they can follow the format. You're not going to do that with COs, and they're not that free and wiling to write chronos, positive chronos like these, and you have quite a few of them, you got them from, also your, the chaplain, and other staff members, and they attest to your changes and your positive behavior. Again, psychiatric report dated 7/8/05, by Dr. Mary Smith, is favorable. Says that the propensity for violence would be expected to be similar to that of an average citizen. You would not be expected to pose an increased risk to public if he didn't change his sobriety and remain distant from any gang related

associates. You've done that. You've showed it. You've done that for over 10 years. And in your case, action, the action has been (inaudible). Your base term is 124 months and you're getting credit for 50 months and your total period of confinement will be 94 months and you will (inaudible). Now, if released, you understand this is not final. If released you would have special conditions of parole. Number 1, you are not to consume alcohol; number 2, you're to submit to (inaudible) testing, submit to (inaudible) testing, initially and you'll be directed anyway by the parole agent, you're to attend POC, parole outpatient clinic, and definitely you, because of your priors, you're not to associate with any gang members. Sir, that being said, if you have gang members in your family, you better alert your agent, know, you better, you need to walk a very straight line because they make no exceptions whether they're family members or not. OK?

**INMATE GARDUNO:** Yeah.

**PRESIDING COMMISSIONER BIGGERS:** Let me explain to you what's going to transpire. This decision will (inaudible) for full board involvement here. Your attorney will would have the opportunity to speak at the hearing concerning your case. At that point the board will decide, in full session, whether or not to either go with the deputy commissioner or to go with

myself. Again, (inaudible) and once that is done, if you do get a, and they go with the deputy commissioner, then you will get a date; if they go with me, then I would recommend a one-year denial. Now, please don't misunderstand what I'm telling you, that's the way I feel, and I think that, I think you are programming well. I think you're doing a lot of things in the right direction, but at the same time I still feel that you (inaudible) too recent to accept the fact that, you know, you could have killed that individual and on top of that there was no reason for it. You didn't even think about the fact, and I realize that you're moving in the right direction, I just think you need some more time. Do you have any questions for me, sir?

**INMATE GARDUNO:** No I don't, Commissioner.

**PRESIDING COMMISSIONER BIGGERS:** Okay, that concludes the hearing, the time is now 1:30, good luck to you, sir.

**INMATE GARDUNO:** Thank you.

**A D J O U R N M E N T**

--oOo--

**HELD OVER FOR SPLIT DECISION REVIEW**

PENDING REVIEW AND APPROVAL

**THIS DECISION WILL BE FINAL ON:________________**

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, SHELLEY KELBER, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1-70, and which recording was duly recorded at IRONWOOD STATE PRISON, BLYTHE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ARMANDO GARDUNO, CDC Number E-92339, on November 16, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 13, 2006 at Sacramento County, California.

Shelley Kelber, Transcriber

**Northern California Court Reporters**

# EXHIBIT B

INMATE COPY

IRONWOOD STATE PRISON
PSYCHOLOGICAL EVALUATION TO THE BOARD OF PRISON TERMS
PSYCHOSOCIAL EVALUTION
Subsequent #3 Hearing
July 2005

**I/M NAME:** **Garduno, Armando**
**CDC #:** **E-92339**
**DOB:** **02/04/70**
**Received by CDC:** **04/11/91**
**Transferred to ISP:** **05/07/02**
**Current Housing:** **A2-240U**

Information for this evaluation was gathered from California Department of Corrections Central File, Unit Health File and approximately two hours of structured and unstructured interview with the inmate. Inmate Garduno was informed as to the nature and purpose of this evaluation. He understood the limits of confidentiality and willingly agreed to participate.

**I. Identifying Information:**
Inmate Garduno is a thirty-five year old male of Mexican heritage who was found guilty by jury trial of Attempted Murder 1st Degree and was sentenced to Seven Years to Life. Inmate Garduno was twenty years old, 5'5" tall, weighing 120 pounds when he was convicted. This is his first prison term.

Inmate Garduno was a member (associate) of South Fonta gang. His nickname is "*Mondo*" and he has tattoos on his back, the name of his former wife on the side of his neck and the initials *"I"* on his right shoulder and *"E"* on his left shoulder for Inland Empire. His also has a surgery scar visible on his throat.

He has a history of being involved in gang related street violence. His seventeen year old victim was identified as being a member of a rival gang involved in territorial rights disputes with South Fonta (South Fontana). He is now divorced but was married at the time of the commitment offense. He states that he is of a Protestant faith.

There is no juvenile criminal history on record. Adult convictions include (10/19/88) arrested for assault by means to produce great bodily injury; possession of alcohol (04/23/89; Driving Under the Influence (11/20/89) and the commitment offense (06/15/90) Attempted Murder 1st Degree. He has previously been sentenced to serve one hundred eighty days, three days, and five days in county jail and two years at C&RR. Between December 1987 and July 1990 it is reported that he had nine separate and unrelated convictions with six of those resulting in Failure to Appear.

INMATE COPY

INMATE COPY

Early adjustment to prison was problematic. He acknowledged that he did not know how to manage himself on regards to "prison politics" and made poor choices. Disciplinary 115 record includes being found guilty for a stabbing assault (05/28/91), fighting (12/13/91), physical altercation (01/28/92) and racial physical altercation/confrontation (01/18/93). He received a 128A for Excessive contact during visit when he reportedly hugged his wife for too lengthy a period.

Inmate Garduno reports *"I gave my life to the Lord" in 1993"*. His last disciplinary action was received in 1993.

**II. Developmental History**
Inmate Garduo reports that he was born in Mexico but his parents were citizens of the United States. He is not aware of any prenatal or perinatal concerns. There were no birth defects. Developmental milestones were met without problem.

He reports that he was never cruel to animals. He does not recall any difficulty with enuresis or incidences of arson. His family was financially poor but participated together going fishing at Prado Park and at Silverlake Regional Park. As a child he liked animals and art.

The only significant childhood medical history he can recall was breaking his collarbone when he jumped off of a roof when he was ten years old. No loss of consciousness reported.

**III. Education:**
Inmate Garduno dropped out of Fontana High School during the first few weeks of 10th grade. He was approximately sixteen years old. He felt the he would rather work and earn money. Prior to the 9th grade he states that he had been a "good student" and had been successful in classes such as pre-algebra.

After an initial adjustment to prison a change took place. He began to focus on positive endeavors and completed his General Education Development (GED) in 07/26/94. He worked as a Teacher's Aide in English as a Second Language classes and provided tutoring in college level classes.

Through correspondence coursework with Coastline Community College he has completed 39 units in General Studies. He plans to continue in college with a major in Psychology. He is also involved in the Family Radio School, a religious studies program. Since 1996, he has completed the limit of one course per semester in the Family Radio School religious studies program.

Inmate Garduno has completed numerous self-help programs. He has successfully completed the Peer Inmate Educator program. A program that utilizes informed inmates to provide education to other inmates on specific topics, such as Sexually Transmitted Diseases, etc.

INMATE COPY

INMATE COPY

Beyond tutoring, he mentors others and holds Bible Studies, attends the Voluntary Lifer's Group, and completed Cage Your Rage and Breaking Barriers programs. He is active in Alcoholics and Narcotics Anonymous Self-Help programs. He was in the Facility A Honor's Program while at California State Prison, Los Angeles County, Lancaster.

**IV. Family History**

Inmate Garduno was raised with five siblings and his married parents. He was raised in a Catholic home. His father, Jose Garduno, worked in the construction trades supporting the family. His mother remained a homemaker. His parents now live in Hesperia. Family members try to visit him every two to three months.

Inmate Garduno is the only family member with a criminal history. He maintains contact with his family through visits, phone calls and in letters. Oldest sister Ophelia, is a teacher in Fontana. Sylvia works as a clerk. Linda is an intern in nursing at Loma Linda Medical Hospital. Both of his brothers joined the United States Navy. Brother Javier has completed his medical degree and may be completing his last year of residency. Youngest brother Jerido, has been discharged for the Navy and is thinking about becoming an architect. Jacklin (?) was identified in a previous report but was not mentioned in this interview.

**V. Psychosexual Development and Sexual Orientation**

Inmate Garduno states that he is heterosexual in orientation. He had his first girlfriend from age 13 to 15. His relationship with his second girlfriend began around age 15. She later became his wife and is the mother to his children.

He reports that he became sexually active at age fifteen. He states that he did "*go out*" on his wife while they were married. No high-risk sexual behaviors are reported beyond his occasional infidelity.

**VI. Marital History**

Near the age of sixteen, Inmate Garduno moved in with his high school girlfriend, Paula Gonzales and her family. They eventually rented a place of their own in Highland, California. His first son was born before he had reached age nineteen. He was arrested prior to the date they had set for their formal marriage. Although his arrest interrupted their wedding date, the judge did allow them to get married while he was under arrest for the commitment offense.

He and Paula Gonzalez produced two sons, Armando (almost 16) and Anthony (15). Their marriage lasted from 1990 until 1996. The marriage ended in divorce. Paula eventually remarried. Inmate Garduno is supportive of his sons having a stepfather. "*He involves them in sports and is a good husband to Paula.*" They have spoken on the phone and inmate Garduno believes him to be a good man. He saw his sons last year and believes the children will visit this summer.

INMATE COPY

INMATE COPY

**VII. Military History**
Inmate Garduno did not serve in the military. His two brothers enlisted and served in the United States Navy.

**VIII Employment/Income History**
After dropping out from high school, inmate Garduno was employed by DiCarlo Concrete Construction in Rancho Cucamonga as a laborer and finisher until his arrest. He was earning approximately $12.00 per hour.

He has successfully held various prison jobs. He has worked as a Barber, on the Yard Crew, in the Central Kitchen, as an uncertified Clerk in the program office and in the Chapel. He has been a Teacher's Assistant for English as a Second Language. He has worked in the PIA Upholstery and in vocational Textiles.

Inmate Garduno is an accomplished artist. Upon my request he brought artwork to the Health Services Clinic after the interview was completed. He reports that he once sold a painting for $500.00. He states that he would enjoy the work of an architect while ministering his faith with others.

**IX. Substance Abuse History**
Prior to his arrest inmate Garduno began experimenting with marijuana and alcohol in the 9th grade. Between ages eighteen and nineteen he was charged with a Minor in Possession of Alcohol and for Driving Under the Influence. Drinking whenever alcohol was available, he developed a pattern of heavy "binge" drinking on Friday and Saturday nights. He reports that he had been drinking when the commitment offense occurred.

While in prison he has attended both Alcoholics and Narcotics Anonymous Self-Help programs. Attendance is compromised by Yard shutdowns.

**X. Psychiatric and Medical History**
Inmate Garduno reports that he had an appointment with a CDC psychiatrist in 1991 due to difficulty sleeping.

Medical history includes being hit on the head with loss of consciousness at the age of sixteen. He also fell off of a roof (age 17) when he was drunk and sustained loss of consciousness. In 1989 he fell asleep and his car crashed into a palm tree. He was hospitalized for one month. A scar on his neck gives evidence of the tracheotomy surgery performed. He was eighteen or nineteen years old.

**XI. Plans if Granted Release**
Inmate Garduno has multiple letters of support from family members in his Central File offering supportive arrangements for living. He also has letters indicating employment opportunities and specific job offers.

If release were granted, he would initially live with his mother and father in Hesperia, California. He would prefer not to return to live in Fontana.

INMATE COPY

INMATE COPY

Santana Concrete Construction, located in Bloomington, has offered him full time employment. This construction company serves the entire Inland Empire. Inmate Garduno states that transportation to work from Hesperia would not be problematic because there are many job sites in and around Hesperia. He also has alternative documented offers of employment in his Central File.

Inmate Garduno appears to have made adequate preparation towards employment and living arrangements if his release were to be granted.

**XII. Current Mental Status/ Treatment Needs**
Inmate Garduno is 5' 5" and weighs approximately 139 pounds. He is well groomed with short hair. He has a very youthful appearance. He wears glasses and is nearsighted.

He was oriented to person, time, place and purpose. He understood and accepted the limitations of confidentiality. Eye contact was good. Thought processes normal. Remote and recent memories appear to be intact. No evidence of suicidal or homicidal ideation. Mood and affect congruent. No evidence of a major psychological disorder.

**Diagnostic Impression DSM IV:**
*Disclaimer: The following diagnostic impressions are made following criteria included in the DSM-IV TR manual. These criteria make it possible to standardize diagnostic criteria for each mental disorder, thus providing professionals a more standardized means to communicate and treat individuals accordingly. It is important to note that a diagnosis does not necessarily reduce or sacrifice individual's responsibility for their actions.*

| | |
|---|---|
| Axis I. | 303.90 History of Alcohol Abuse, in remission |
| Axis II. | 312.8 Conduct Disorder, Adolescent Onset |
| Axis III. | No Diagnosis |
| Axis IV. | Stressors related to Life Term and incarceration |
| Axis V. | Global Assessment of Functioning (GAF) 90 |

INMATE COPY

**XIII. Review of Life of Crime**
Inmate Garduno states that he had pneumonia and was staying in Fontana at his mother's so that she could transport him easily to nearby medical clinic in Fontana for treatment. He had a two-week medical leave from work.

Prior to the commitment offense he was convicted of a misdemeanor for an assault to commit great bodily injury (10/19/88). He was found guilty as charged for the commitment offense (10/06/89) by a jury. This offense was similar to the commitment offense in which inmate Garduno was identified as being one of four attackers upon one victim. The particulars of each case may benefit from further discussion with inmate Garduno.

INMATE COPY

In the inmate's own words:
*A couple of my friends stopped by to pick me up. My mother did not know they came by. She did not like them and would tell them to leave whenever she saw them. I left with them and she did not see me go. We were acting reckless and drinking. We came across the victim. We passed him and we both gave hand gestures. I didn't know him but he must have known me through my brother.*

*The codefendent Ramirez was driving. There was talking back and forth. The victim was not by himself. "Where are you from?" and yelling back and forth.*

*I was croched down in the front passenger seat. I grabbed the gun, a pistol grip shot gun (12 gauge) and I exited the car. I shot him in both legs from about 12 to 13 feet. Pellets hit him in both legs. While he was trying to crawl away I shot his in the arm below the elbow. I ran back into the car and they dropped me off at my mom's house and then returned to Highland.*

*My family called me the next day and said that the police were looking for me. I talked to my family and I decided to turn myself in at the San Bernardino Sheriff's Department on the warrant.*

*I have tried to examine it from different angles. I think it came from me trying to fit in. I had a very poor self-concept and when I was drinking I felt better. I think I was trying to prove that I was strong to them.*

*I think about it now. What if someone did the same thing to one of my sons? I see it very differently now. I was not a gang member but I affiliated with gang members. Those are the people I hung out with.*

Inmate Garduno expressed remorse for his actions. He reports that he has spent much time trying to understand his thinking and his actions at the time of the commitment offense. His analysis may be correct. He was trying to fit in, to be accepted in a larger group, and trying to prove himself. He came from a family that had struggled to maintain food and shelter. His siblings all completed college. He did not have any learning disorders impeding academic success. The source of his low value of himself was not identified.

**XIV. Assessment of Dangerousness**
Disclaimer: *It is impossible to predict with scientific certainty that any individual will or will not reoffend. There are factors that seem to identify the probability of reoffending as well as the possibility of a successful adjustment back into society without recidivism.*

If inmate Garduno were released into the community at this time, his propensity for violence would be expected to be similar to that of an average citizen. He would not be expected to pose an increased risk to the public if he maintained his sobriety and remained distance from any gang related associates.

INMATE COPY

INMATE COPY

Previous risk factors of immaturity, environmental influences, poor self-value, stress related to supporting a child, marital discord, poor coping with increased drinking and gang membership appear to have resolved or improved.

He has matured. He has maintained contact with his supportive family. He is no longer married but is supportive of his sons' stepfather. He has replaced negative social and environmental influences with more positive religious based supports.

In the prison population, inmate Garduno's propensity for violence would be similar to that of a Level I inmate. He entered prison in 1991. During his initial adjustment period he was influenced by prison politics. He reports that he really did not know how to function in the prison. He became involved with negative influences. This is documented by a series of serious 115 Disciplinary Actions, specifically four 115s from 05/28/91 until 01/18/93.

Inmate Garduno reports that he began to think about his family and his actions. He made the decision to change his thinking and to become a productive person. In 1993, inmate Garduno made a life changing decision. He became a Christian and *"gave my life to the Lord"*. He reports it was difficult initially due to the expectations of political forces on the Yard. When he was transferred to Lancaster it improved. He came to Ironwood State Prison as an active Christian and he reports no "political" problems.

**XV. Clinician Observations/Comments/Recommendations** 7 Yrs. + Life

Inmate Garduno has completed fifteen years of a sentence of ~~15 Years to Life~~. He entered prison at the age of twenty. He accepts responsibility for his actions. He expresses remorse with a greater insight now that his own children are nearing the age of his victim.

His assessment that he was *"trying to fit in"* and was "*showing off*" for the gang involved individuals in the car may have been actual factors in his crime. His crime was vicious and calloused towards a vulnerable victim. It seems to beyond the expression of desiring peer approval. The question of why he expressed, whatever the need in this manner, with a child and wife to support, may be clarified with further self-analysis.

On his behalf, his record supports his statements of making a decision to leave the gang related life style and to become a productive person. He has put forth effort to meet the recommendations from the lat Board of Prison Terms Hearing. He ha engaged in Self-Help programs, taking coursework and through volunteering. He has earned laudatory chronos.

Inmate Garduno appears to have chosen to benefit from incarceration. He has matured and has taken advantage of available educational, vocational and self-help programs within the institution. He has discovered his artistic talent and is exploring occupations in which his talents might be utilized.

INMATE COPY

INMATE COPY

After an initial period of adjustment, inmate Garduno has maintained a positive program disciplinary free. His record supports his efforts towards personal growth beginning in 1993 when he made a religion-based decision.

It is recommended that inmate Garduno continue to participate in Alcoholics and Narcotics Anonymous programs to support his commitment to sobriety.

Inmate Garduno does not have a diagnosis of a major psychological condition. He is responsible for his actions. If he had solid living arrangements and was gainfully employed, he is not expected to present a risk to society if he maintains his sobriety and does not associate with any gang related individual(s).

The standards that this inmate must meet in order to be granted release rather than serve the entire life sentence are unclear to this examiner. He has benefited from his incarceration and has sought rehabilitation. It appears that this inmate has fulfilled the goals and recommendations of the Board of Prison Terms.

Respectfully Submitted by:

Meredith B. Smith, Ph.D.
Staff Psychologist

July 8, 2005
Date of Report

INMATE COPY

# EXHIBIT C

INMATE COPY

| LIFE PRISONER EVALUATION |
|---|
| PAROLE CONSIDERATION HEARING #3 |
| OCTOBER 2005 CALENDAR |

**NAME: GARDUNO, ARMANDO** **CDC#: E92339**

I. COMMITMENT FACTORS:

A. LIFE CRIME:
Controlling Offense: PC664/187, Attempted Murder 1st.
Non-Controlling: PC12022.5 Use of Firearm, and PC 12022.7 Causing Great bodily Injury.
Weapon: Shotgun.
County/Case Number: San Bernardino County/ #SCR52216.
Victim: Armando Guerra, 17 years old.
Received CDC: April 11, 1991.
Sentence: Life plus seven years.
MEPD: 03/08/2002
References: Probation Report dated 11/11/1990. Legal Status Report, CLETS Report, and Abstract of Judgment.

1. Summary of Crime:
On June 12, 1990, victim (Mr. Guerra) stated he was traveling southbound through a field, when he initially observed three subjects driving in a car. He stated he recognized one of the subjects from a prior incident. At that time, the vehicle passed the victim and slowly came to a stop. Garduno exited the vehicle and began walking aggressively towards Guerra. Guerra noticed Garduno carrying what appeared to be a twelve gauge blue steel, pistol grip style shotgun. Garduno asked Guerra, "Where are you from?" Guerra stated, "From your mama". At this time, Garduno lifted the shotgun and fired one round, spraying both of Guerra's right and left legs from the thighs down. Guerra made an attempt to run, but he just fell down. Garduno walked forward, raised the shotgun towards the victim and fired a second round, striking Guerra in the left elbow area. Guerra had lost a great amount of nerves and lost a majority of the feeling in his hand, as well as the movement and motor skills in his left arm; according to the report in the Central File.

2. Prisoner's Version:
As provided by Inmate Garduno: On June 12, 1990, A few occupants and I were drinking and driving around in a red Ford Escort acting reckless. I then found myself at the location of Citrus and Merrill in Fontana, where I was involved in a shooting incident. I was in the car when an occupant in the car and Mr. Guerra, the victim, exchanged words. I then exited the vehicle with a pump shotgun that was going to be used to scare Mr. Guerra. However, words got so heated that I then shot Mr. Guerra in the legs. I then proceeded to walk toward Mr. Guerra who was lying on his side with his arm stretched out away from his body. I then shot Mr. Guerra in the arm and walked back into the vehicle that fled the scene.

INMATE COPY

INMATE COPY

3. Aggravating/Mitigating Circumstances:

a. Aggravating Factors:

1. The crime involved great violence; great bodily injury and the act disclosed a high degree of cruelty and viciousness.
2. Garduno was armed with and personally used a weapon, a shotgun.
3. Garduno engaged in a pattern of violent conduct, which clearly indicates a serious danger to society.
4. Garduno was on grant of court probation for an alcohol related offense when he committed the present offense.

b. Mitigating Factors:
None.

B. MULTIPLE CRIME(S):

1. Summary of Crime:
None.

2. Prisoner's Version:
None.

II. PRECONVICTION FACTORS:

A. JUVENILE RECORD:
Garduno has no noted juvenile record.

B. ADULT CONVICTIONS AND ARRESTS:
10/19/88 Arrested by Fontana PD for assault by means to produce GBI. Guilty, Misdemeanor, 180 days county jail.
04/23/89 Arrested by Fontana PD for Possession of Alcohol. Guilty, three days county jail.
11/20/89 Arrested by CHP for Driving Under the Influence. Guilty, two years at C&RR and 45 days county jail.
06/15/90 Arrested by Fontana PD for Attempted Murder 1st, Instant Offense.

C. PERSONAL FACTORS:
Garduno is a 35 year old, first termer. Convicted from San Bernardino County for PC187, Attempted Murder 1st and PC12022.5, Use of Firearm. Received into CDC on 04/11/91 serving a sentence of Life plus 7 years. His MEPD is 03/08/02. He was born in Mexico. He has four sisters whom he writes with and visits with frequently. He also has two brothers whom he has good relations with. He writes and visits with his mother and father. Garduno was previously married but now is divorced. He has two sons by his former marriage and they reside with their mother. He admits to his alcohol use as a youth. Central File also states that he was a member of a South Fontana gang. He attended Fontana High School up to the 10th grade.

INMATE COPY

INMATE COPY

III. POSTCONVICTION FACTORS:

A. SPECIAL PROGRAMMING/ACCOMODATIONS:
No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan.

B. CUSTODY HISTORY:

| | | |
|---|---|---|
| CIM/RC | 04/11/91 | Unclassified |
| CSP/FSP | 05/09/91 | Close-B |
| FSP/Old | 05/13/91 | Close-B |
| CSP/FSP | 05/28/91 | MAX-A |
| PBSP/SHU | 10/15/91 | MAX-A |
| CCI-IV | 06/23/93 | Close-B |
| CSP/LAC | 10/26/98 | MED-A |
| ISP-III | 05/07/02 | MED-A |

C. THERAPY AND SELF-HELP ACTIVITIES:
02/15/05 Completion of 13 weeks of Alcoholics Anonymous meetings.
12/30/04 Completion of a 6-month study program, "Therapeutic Rehabilitative Training".
12/28/04 Completing 39 weeks of Narcotics Anonymous.
10/06/04 Creating a "Victims Awareness Program".
10/04/04 Demonstrating a positive influence in the AA/NA group on 'A' Facility.
09/28/04 Completing 26 weeks of Narcotics Anonymous meetings.
09/29/03 Completing 26 weeks of Narcotic's Anonymous.

D. DISCIPLINARY HISTORY:
None.

E. OTHER:
On 01/02/03, received certificate of completion for Volunteer Tutor Workshop. On 06/30/03, received certificate of completion for Garment Making Program. On 08/25/03, received certificate of achievement for Reading Tutor Program. Received Narcotics Anonymous certificate dated 09/29/03. Received certificate of recognition for 40 hours in Literacy dated 04/01/04. Received certificate of achievement for Bridging Program/ESL-GED dated 04/22/04. Received Alcoholics Anonymous certificate for successful completion of the 26-week self-help program dated 05/12/04. On 02/28/05 received certificate Braking Barriers 17 lessons/Facilitator Training. On 05/2005 Received certificate for Participation-Cinco de Mayo Hispanic Heritage. On 04/21/05 Received certificate for Achievement Literacy Tutoring Program. On 06/29/05 Completed 78 weeks Self-Help Program, including 12 Steps of Alcoholics Anonymous.

IV. FUTURE PLANS:

A. RESIDENCE:
Garduno plans on residing with Gloria and Jose Garduno, his mother and father, at 9658 Verdugo Ave in Hesperia, CA 92345. Telephone number (760) 949-0096.

INMATE COPY

INMATE COPY

B. EMPLOYMENT:
Garduno plans on being employed by Santana Concrete Construction Company at 18241 Slover Ave. Bloomington, California 92316. Alternate employment would be working with his sister, Linda Hudson doing photography.

C. ASSESSMENT:
The last BPT hearing was held on 10/19/04. Parole is denied 10/23/01 and 11/04/02. BPT recommends self-help programs, remains disciplinary free, participate in additional vocational trades, improve his vocational skills and continue his participation in self-help programs.

V. USINS STATUS:
Garduno is a United States citizen.

VI. SUMMARY:

A. No assessment regarding parole risk was made at this time, per memo dated 08/04 until further notice from BPT.

B. Prior to release Garduno could benefit from:
1. Remain disciplinary free.
2. Participate in additional vocational trades. – Improve his Vocational skills.
3. Continue his participation in self-help programs.

C. This report is based on approximately eight hours of Central File review and approximately one hour of interview with Garduno completed on 07/21/05.

D. Garduno was afforded the opportunity to review his Central File on 07/21/05.

E. No accommodation was required per the Armstrong Vs Davis BPT Parole Proceedings Remedial Plan for effective communication.

| Prepared by: | Reviewed by: | Reviewed by: |
|---|---|---|
| M. Manny | | |
| CCI M. Manny | CCII N. McDowell | C&PR (A) M. Wellard |

INMATE COPY

INMATE COPY

**BOARD OF PRISON TERMS** **STATE OF CALIFORNIA**
**LIFE PRISONER: PROGRESS REPORT**

**[ ] DOCUMENTATION HEARING**

**[X] PAROLE OCNSIDERATION HEARING (LIFE HEARING)**

**[ ] PROGRESS HEARING**

**To Complete Form:**

To CDC Staff: Document each year from date life term starts to present.

To BPT Staff: For each year added, apply original parole date guidelines (i.e. 0-2 months for PBR and 0-4 months for BPT. See California Code of Regulations, Title 15, Sections 2290-2292, 2410 and 2439)

| CREDIT APPLIED | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 8/26/04 TO Present | | | **ADDENDUM**<br><br>PLACEMENT: Remains at Ironwood State Prison-III, Facility A.<br><br>CUSTODY: Remains at Medium A custody.<br><br>VOCATIONAL TRAINING: None noted this reporting period.<br><br>ACADEMICS: None noted this reporting period.<br><br>WORK RECORD: Remove from current assignment (Teacher's Aide/Adult Basic Education I), due to non-availability of instructors. 02/15/05. CDC 101 Work Supervisor's Report reflects assigned as Porter-A. 150. Satisfactory Performer. 04/28/05.<br><br>GROUP ACTIVITIES: Successfully completed 26 weeks of Alcohol Anonymous 9/28/04. Lifer's Group Certificate of Completion (Rehabilitative Therapeutic Techniques Training) 12/30/04. Certificate of Achievement (Literacy Tutoring Program) 08/27/04. Completion of Basic Infectious Disease Requisite for the Inmate Peer Education Program. 09/10/04<br><br>PSYCHIATRIC TREATMENT: None noted this reporting period.<br><br>PRISON BEHAVIOR: Remained disciplinary free this reporting period.<br><br>OTHER: Received 128-B Laudatory Chronos dated 10/04/04, 09/30/04, and 09/28/04. |

Name of Correctional Counselor (Print) M. Manny

Signed *M. Manny* Date *7-11-05*

| NAME | CDC | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| GARDUNO, A. | #E92339 | ISP | SUB #3 | 10/2005 |



INMATE COPY

# PROOF OF SERVICE BY MAIL

I, THE UNDERSIGNED, CERTIFY THAT I AM OVER THE AGE OF (18) YEARS OF AGE: THAT I CAUSED TO BE SERVED A COPY OF THE FOLLOWING DOCUMENTS:

ENTITLED: **PETITION FOR WRIT OF HABEAS CORPUS WITH EXHIBITS.**

BY PLACING THE SAME IN AN ENVELOPE, SEALING IT BEFORE A CORRRECTIONAL OFFICER, AND PLACING IT IN THE **[UNITED STATES MAIL]** AT AVENAL STATE PRISON. AND ADDRESSED IT TO THE FOLLOWING:

CLERK OF U.S. DISTRICT COURT
ROOM 4290, 880 FRONT STREET
SAN DIEGO, CA. 92101-8900

EXCUTED ON JUNE 04, ______, 20 08, AT AVENAL STATE PRISON. AVENAL, CALIFORNIA.

I, ARMANDO GARDUNO, DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FORGOING IS TRUE AND CORRECT.

Armando Garduno
SIGNATURE OF DECLARANT

ARMANDO GARDUNO CDC # E-92339
PRINTED NAME OF DECLARANT

**PRO PER.**

JS44

(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

2254 1983
FILING FEE PAID
Yes ___ No ✓
IFP MOTION FILED
Yes ✓ No ___
COPIES SENT TO
Court ✓ Pro Se

FILED
JUN 13 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

I (a) PLAINTIFFS

**Armando Garduno**

DEFENDANTS

**Board of Parole Hearings**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Kings
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

**Armando Garduno**
**PO Box 9**
**Avenal, CA 93204**
**E-92339**

ATTORNEYS (IF KNOWN)

**'08 CV 1058 JAH NLS**

II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III

III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

**28 U.S.C. 2254**

V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

CONTRACT
- ☐ 110 Insurance
- ☐ Marine
- ☐ Miller Act
- ☐ Negotiable Instrument
- ☐ 150 Recovery of Overpayment &Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153Recovery of Overpayment of Veterans Benefits
- ☐ 160 Stockholders Suits
- ☐ Other Contract
- ☐ 195 Contract Product Liability

REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Eiectmant
- ☐ 240 Tort to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

TORTS

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury- Medical Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☒ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights

FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

LABOR
- ☐ 710Fair Labor Standards Act
- 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

SOCIAL SECURITY
- ☐ 861 HIA (13958)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

OTHER STATUTES
- ☐ 400 State Reappointment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities Exchange
- ☐ 875 Customer Challenge 12 USC
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State
- ☐ 890 Other Statutory Actions

VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appelate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

VII. REQUESTED IN COMPLAINT: ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 DEMAND $ Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☐ NO

VIII. RELATED CASE(S) IF ANY (See Instructions): JUDGE Docket Number

DATE 6/13/2008 ~~SIGNATURE OF ATTORNEY OF RECORD~~

R.Mullen

CR